IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LAKISHA BRIGGS                 :
                                         :       CIVIL ACTION
                Plaintiff,    :
                                           :
                v.                     :       NO. 2:13-cv-02191-ER
                                           :
BOROUGH OF NORRISTOWN and DAVID R.   :
FORREST, ROBERT H. GLISSON, RUSSELL J.   :
BONO, WILLIE G. RICHET and JOSEPH E.      :
JANUZELLI, in their individual and official capacities :
                                           :
               Defendants.    :
                                           :

## ORDER

AND NOW, this _____ day of _____, 2013, upon consideration of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint and Plaintiff Lakisha Briggs' Response in Opposition thereto, IT IS ORDERED that the Motion to Dismiss is GRANTED in part and DENIED in part.  The Motion to Dismiss is GRANTED with respect to Plaintiff's claim under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*, and that claim is DISMISSED without prejudice.  The Motion to Dismiss is DENIED with respect to the remainder of Plaintiff's claims.

BY THE COURT:

_____
EDUARDO C. ROBRENO, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

LAKISHA BRIGGS                                   :
                                                 :        CIVIL ACTION
                             Plaintiff,          :
                                                 :
                    v.                           :        NO. 2:13-cv-02191-ER
                                                 :
BOROUGH OF NORRISTOWN and DAVID R.               :
FORREST, ROBERT H. GLISSON, RUSSELL J.           :
BONO, WILLIE G. RICHET and JOSEPH E.             :
JANUZELLI, in their individual and official capacities :
                                                 :
                             Defendants.         :
                                                 :

---

**PLAINTIFF LAKISHA BRIGGS' RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Dated:  June 3, 2013

/s/ Sara J. Rose                                 /s/ Peter M. Smith
Witold J. Walczak (PA 62976)                     M. Duncan Grant (PA 21726)
Sara J. Rose (PA 204936)                         Peter M. Smith (PA 93630)
American Civil Liberties Foundation              Matthew E. Levine (PA 309419)
of Pennsylvania                                  T. Stephen Jenkins (PA 311104)
313 Atwood Street                                PEPPER HAMILTON LLP
Pittsburgh, PA  15213                            3000 Two Logan Square
412.681-7864 (telephone)                         Eighteenth & Arch Streets
412.681.8707 (facsimile)                         Philadelphia, PA  19103-2799
vwalczak@aclupa.org                              215.981.4000 (telephone)
srose@aclupa.org                                 215.981.4750 (facsimile)
                                                 grantm@pepperlaw.com
                                                 smithpm@pepperlaw.com
/s/ Sandra S. Park                               levinem@pepperlaw.com
Sandra S. Park                                   jenkinst@pepperlaw.com
Lenora M. Lapidus
American Civil Liberties Union
Women's Rights Project
125 Broad St. 18th Fl.

New York, NY 10004
212.519.7871 (telephone)
212.549.2580 (facsimile)
spark@aclu.org
llapidus@aclu.org

*Attorneys for Plaintiff Lakisha Briggs*

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

II.    STATEMENT OF FACTS ................................................................... 3

     A.      The Old Ordinance ................................................................. 3

     B.      Episodes Of Domestic Violence ............................................ 5

         1.      Early Incidents ............................................................ 5
         2.      April 9, 2012 Incident ................................................ 6
         3.      April 15, 2012 Incident .............................................. 6
         4.      May 2, 2012 Incident ................................................ 7

     C.      Meeting With Borough Officials ........................................... 8

     D.      June 23, 2012 Incident .......................................................... 9

     E.      Eviction Proceedings ........................................................... 11

         1.      First Eviction Hearing............................................... 11
         2.      Second Eviction Hearing – August 22, 2012............. 11

     F.      Subsequent Attempts to Remove Ms. Briggs ....................... 12

     G.      Notice of Constitutional Violations Under the Old Ordinance............................ 12

     H.      The New Ordinance .............................................................. 14

     I.      The New Ordinance Continues to Violate Ms. Briggs' Constitutional Rights ................................................................ 17

     J.      The New Rental Property....................................................... 18

III.   ARGUMENT ...................................................................................... 18

     A.      Standard of Review............................................................... 18

     B.      The Old Ordinance Violated and the New Ordinance Continues to Violate Ms. Briggs' Right to Petition the Government for Redress of Grievances as Protected by the First Amendment to the United States Constitution. ............ 20

         1.      The Law Is Clear that Ms. Briggs Has a First Amendment Right to Seek the Assistance of Law Enforcement.................................................. 20
         2.      The Old Ordinance Caused and the New Ordinance Causes a Concrete, Tangible and Ongoing Chilling Effect on Ms. Briggs' First Amendment Rights.................................................. 22
         3.      The Old and New Ordinances Cannot Withstand Strict Scrutiny............. 28
         4.      Ms. Briggs Has Standing to Bring Her First Amendment Claims and this Case Is Ripe for Judicial Review. .............................................. 31

     C.      The Old Ordinance Violated and the New Ordinance Continues to Violate Ms. Briggs' Right to Be Free from Unreasonable Interference with Her Property Interest as Protected by the Fourth Amendment to the United States Constitution. ............................................... 33

D. The Old Ordinance Violated and the New Ordinance Continues to Violate Ms. Briggs' Right to Procedural Due Process as Protected by the Fourteenth Amendment to the United States Constitution. .................................. 36

E. The Old Ordinance Violated and the New Ordinance Continues to Violate Ms. Briggs' Right to Be Safe from State-Created Danger under the Fourteenth Amendment to the United States Constitution. .................................. 42

 1. Defendants knew that their enforcement of the Old Ordinance increased the risk of domestic violence to Ms. Briggs. ........................... 43

 2. Defendants acted with deliberate indifference to the harm the Ordinances would cause Ms. Briggs. ........................................ 45

 3. It was reasonably foreseeable that Defendants' enforcement of the Old Ordinance would subject Ms. Briggs to increased risk of harm. ....... 46

 4. Defendants' affirmative actions in enforcing the Old Ordinance against Ms. Briggs and instructing her that any calls to the Norristown police could result in her eviction placed her at an increased risk of severe bodily injury. ...................................... 47

F. The Old Ordinance Violated and the New Ordinance Continues to Violate Ms. Briggs' Right to Equal Protection of the Laws as Protected by the Fourteenth Amendment of the United States Constitution. .................................. 51

G. The Old Ordinance Fails to Provide and the New Ordinance Continues to Fail to Provide Notice of What Constitutes Disorderly Behavior and Results in Discriminatory Enforcement in Violation of the Fourteenth Amendment to the United States Constitution. ....................................... 55

H. The Old Ordinance Discriminated and the New Ordinance Continues to Discriminate on the Basis of Sex in Violation of the Fair Housing Act. .............. 58

I. The Old and New Ordinances Conflict with the Regulatory Scheme of the Violence Against Women Act in Violation of the Supremacy Clause of the United State Constitution. ................................................................ 64

J. Ms. Briggs May Seek an Order Enjoining Enforcement of the New Ordinance Under the Pennsylvania Constitution. .................................. 67

K. The Individual Defendants Are Not Entitled to Qualified Immunity. .................. 68

L. Norristown Is Subject to Municipal Liability and the Individual Defendants Are Subject to Liability in their Official Capacities. ........................ 72

IV. CONCLUSION .............................................................................. 73

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alvera v. Creekside Village Apartments*, No. 10-99-0538-8 (Dep't of Hous. & Urban Dev. Apr. 13, 2001) ..................................................................................60, 61

*Am. Civil Liberties Union v. N.J. Election Law Enforcement Comm'n*, 509 F. Supp. 1123 (D.N.J. 1981)..................................................................................................28

*Estate of Arrington v. Michael*, Civ. Action No. 11-cv-4534, 2012 U.S. Dist. LEXIS 179222 (E.D. Pa. Dec. 18, 2012) ...................................................................43, 46

*Atl. Pier Assocs., LLC v. Boardakan Rest. Partners*, 647 F. Supp. 2d 474 (E.D. Pa. 2009) ...18, 19

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1988)..........................................52, 54

*Barnette v. Pickering*, Civil No. 09-cv-264-PB, 2009 U.S. Dist. LEXIS 122587, 2010 WL 144359 (D.N.H. 2010) ...................................................................................63

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................................19

*Berrios v. Lancaster*, 798 F. Supp. 1153 (E.D. Pa. 1992) .............................................................33

*Berwick Area Landlord Ass'n v. Borough of Berwick*, 48 A.3d 524 (Pa. Cmwlth. Ct. 2012) .................................................................................25, 30, 41, 69

*Berwick Area Landlord Ass'n v. Borough of Berwick*, Civ. Action No. 4:07-CV-316, 2007 U.S. Dist. LEXIS 51207 (M.D. Pa. July 16, 2007).............................................30

*Betsey v. Turtle Creek Associates*, 736 F.2d 983 (4th Cir. 1984) .................................................61

*Bloomsburg Landlords Ass'n, Inc. v. Town of Bloomsburg*, 912 F. Supp. 790 (M.D. Pa. 1995) .................................................................................................30, 69

*Borough of Duryea v. Guarnieri*, __ U.S. __, 131 S. Ct. 2488 (2001)..................................21, 27

*Bouley v. Young-Sabourin*, 394 F. Supp. 2d 675 (D. Vt. 2005) ..............................................60, 63

*Bright v. Westmoreland County*, 443 F.3d 276 (3d Cir. 2006)......................................................50

*Builes v. Nye*, 239 F. Supp. 2d 518 (M.D. Pa. 2003) ...................................................................51

*Burella v. City of Philadelphia*, 501 F.3d 134 (3d Cir. 2007) .................................................50, 53

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ....................................19

*Burns v. Pa. Dept. of Corrections*, 642 F.3d 163 (3d Cir. 2011).................................................69

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)...........................................27

*Campbell v. City of Berwyn*, 815 F. Supp. 1138 (N.D. Ill. 1993)...................................................62

*Camreta v. Greene*, 131 S. Ct. 2020 (2011) ................................................................................68

*Caulder v. Durham Housing Authority*, 433 F.2d 998 (4th Cir. 1970)...........................................37

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ................................................................55, 56, 57

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) .....................................................66

*DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209 (3d Cir. 2007) ...........................................18

*DePiero v. City of Macedonia*, 180 F.3d 770 (6th Cir. 1999) ......................................................39

*DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989) ...............................42

*Doe v. Butler*, 892 F.2d 315 (3d Cir. 1989) ................................................................................60

*Doe v. LaDue*, 514 F. Supp. 2d 1131 (D. Minn. 2007)..................................................................34

*Edwards v. Media Borough Council*, 430 F. Supp. 2d 445 (E.D. Pa. 2006) ................................62

*Flagner v. Wilkinson*, 241 F.3d 475 (6th Cir. 2001).....................................................................68

*Gale v. Storti*, 608 F. Supp. 2d 629 (E.D. Pa. 2008)....................................................................35

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ..................................................................66

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ......................................................................................37

*Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989) ....................................67

*Grayden v. Rhodes*, 345 F.3d 1225 (11th Cir. 2003)....................................................................39

*Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir. 1994) .......................................................72

*Guarrisi v. Gibbons*, Civ. Action No. 07-5475, 2008 U.S. Dist. LEXIS 81632, 2008 WL 4601903 (E.D. Pa. Oct. 15, 2008)....................................................................................20

*Harris v. Itzhaki*, 183 F.3d 1043 (9th Cir. 1999) .........................................................................61

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ....................................................................................66

*Hynson v. Chester Legal Dep't*, 864 F.2d 1026 (3d Cir. 1988)...............................................51, 52

*Hynson v. Chester*, 731 F. Supp. 1236 (E.D. Pa. 1990)................................................................52

*Jeffries v. Ga. Residential Fin. Auth.*, 503 F. Supp. 610 (N.D. Ga. 1980) ..............................37, 40

*Jones v. City of Philadelphia*, 890 A.2d 1188 (Pa. Cmwlth. 2006).................................................68

*Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004) .............................................................36

*Klump v. Nazareth Area Sch. Dist.*, 425 F. Supp. 2d 622 (E.D. Pa. 2006)...................................68

*Kneipp by Cusack v. Tedder*, 95 F.3d 1199 (3d Cir.1996) ...........................................................48

*Kolender v. Lawson*, 461 U.S. 352 (1983)...................................................................................56

*Kramer v. Price*, 712 F.2d 174 (5th Cir. 1983)...........................................................................56

*Lawrence v. Reed*, 406 F.3d 1224 (10th Cir. 2005)....................................................................71

*Estate of Macias v. Ihde*, 219 F.3d 1018 (9th Cir. 2000)............................................................52

*Malley v. Briggs*, 475 U.S. 335 (1986) ......................................................................................35

*Marcavage v. Borough of Lansdowne*, 493 Fed. Appx. 301 (3d Cir. 2012) .................................34

*Mathews v. Eldridge*, 424 U.S. 319 (1976).................................................................................36

*McMichael v. Chester Housing Authority*, 325 F. Supp. 147 (E.D. Pa. 1971).................37, 38, 39

*Meister v. Kansas City, Kansas Hous. Auth.*, Case No. 09-2544-EFM, 2011 U.S. Dist. LEXIS 19166 (D. Kan. 2011) ...............................................................................................60, 63

*Metro N. Owners, LLC v. Thorpe*, 870 N.Y.S.2d 768 (N.Y. Civ. Ct. 2008) ...............................64

*Metropolitan Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) .................................................................................................................................63

*Meyer v. Bd. of County Comm'rs*, 482 F.3d 1232 (10th Cir. 2007) .............................................21

*Moeller v. Bradford County*, 444 F. Supp. 2d 316 (M.D. Pa. 2006) ...........................................67

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)......................................................35, 53, 72

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375 (3d Cir. 2011) .................................................................................................................................58

*N.N. v. Tunkhannock Area School Dist.*, 801 F. Supp. 2d 312 (M.D. Pa. 2011)..........................68

*Navarro v. Block*, 72 F.3d 712 (9th Cir. 1995) ..........................................................................52

*Neiderhiser v. Berwick*, 840 F.2d 234 (3d Cir. 1988).............................................................31, 32

*Okin v. Vill. of Cornwall-on-Hudson Police Dep't*
  577 F.3d 415 (2d Cir. 2009)................................................42, 45, 46, 48, 50

*Paige v. Coyner*, 614 F.3d 273 (6th Cir. 2010).........................................................35

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972)....................................56, 57

*Pearce v. Labella*, 473 Fed. Appx. 16 (2d Cir. 2012)..........................................48, 51

*Pearson v. Callahan*, 555 U.S. 223 (2009)............................................................69

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)............................19, 43, 46, 47, 50

*Phillips v. Northwest Reg'l Communs.*, 391 Fed. Appx. 160 (3d Cir. 2010)................................50

*Pilchesky v. Miller*, Civ. Action No. 3:CV-05-2074, 2006 U.S. Dist. LEXIS 73681 (M.D. Pa. Oct. 10, 2006) ................................................................24

*Pocono Mountain Charter Sch. v. Pocono Mountain School Dist.*, 442 Fed. Appx. 681
  (3d Cir. 2011)................................................................68

*Pratt v. Camden Hous. Auth.*, Civ. Action No. 05-0544 (NLH), 2006 U.S. Dist. LEXIS 70575 (D.N.J. Sept. 27, 2006) ................................................................37

*Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir.1989)............................68

*Presbytery of the Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454 (3d Cir. 1994) ..........32

*Presley v. City of Charlottesville*, 464 F.3d 480 (4th Cir. 2006) ...................................33

*Project Vote v. Kelly*, 805 F. Supp. 2d 152 (W.D. Pa. 2011) .......................................28

*Raab Family P'ship v. Borough of Magnolia*, Civil No. 08-5050 (JBS), 2009 U.S. Dist. LEXIS 11334 (D.N.J. Feb. 13, 2009) ................................................................60

*Reynolds v. PGB Enterprises, LLC*, 2011 WL 2678589 (E.D. Pa. 2011).....................................67

*Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004)...........................................47, 48

*Robinson v. Vaughn*, Civ. Action No. 92-7048, 1993 U.S. Dist. LEXIS 15566, 1993 WL 451495 (E.D. Pa. 1993)................................................................27

*Roska v. Sneddon*, 437 F.3d 964 (10th Cir. 2006) ................................................72

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983)................................................64

*Smith v. City of Elyria*, 857 F. Supp. 1203 (N.D. Ohio 1994).................................52, 54

*Smith v. Goguen*, 415 U.S. 566 (1974) ................................................................57

*Soldal v. Cook County*, 506 U.S. 56 (1992)........................................................................33

*Steffel v. Thompson*, 415 U.S. 452 (1974) .....................................................................33

*Thurman v. City of Torrington*, 595 F. Supp. 1521 (D. Conn. 1984) ............................52

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ....................................28

*United States v. Chester*, 144 F.2d 415 (3d Cir. 1994)....................................................64

*United States v. Lepore*, 816 F. Supp. 1011 (M.D. Pa. 1991) ........................................61

*United States v. Myers*, 308 F.3d 251 (3d Cir. 2002) ....................................................26

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 .................58

*Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383 (1988).........................................24, 31

*W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85 (3d Cir. 2010).........................19

*Watson v. City of Kansas City*, 857 F.2d 690 (10th Cir. 1988) ...............................52, 54

*Watson v. Phila. Hous. Auth.*, 629 F. Supp. 2d 481 (E.D. Pa. 2009).......................35, 40

*White v. City of Philadelphia*, 118 F. Supp. 2d 564 (E.D. Pa. 2000)........................20, 42

*White v. Lee*, 227 F.3d 1214 (9th Cir. 2000)..................................................................24

*Zenquis v. City of Philadelphia*, 861 F. Supp. 2d 522 (E.D. Pa. 2012) .........................43

**CONSTITUTIONS AND STATUTES**

18 Pa.C.S. § 2711................................................................................................26, 53

Fair Housing Act, 42 U.S.C. §§ 3604, *et seq.*................................................................58

Fed. R. Civ. P. 12(b)(6)....................................................................................................18

U.S. Const. art. VI, cl. 2....................................................................................................64

Violence Against Women and Department of Justice Reauthorization Act of 2005,
    42 U.S.C. § 1437f, *et. seq* ....................................................................64, 65, 67

Violence Against Women Reauthorization Act of 2013, P.L. 113-4 ...............64, 65, 67

**OTHER AUTHORITIES**

24 C.F.R. § 100.60(b)(5)....................................................................................................61

24 C.F.R. § 100.65(b)(4)....................................................................................................62

24 C.F.R. § 100.70(d)(4)................................................................................................62

Callie Marie Rennison, *U.S. Dep't of Justice, Crime Data Brief: Intimate Partner Violence*, 1993-2001 (2003)..................................................................................59

Deborah K. Anderson & Daniel G. Saunders, *Leaving an Abusive Partner: An Empirical Review of Predictors, the Process of Leaving, and Psychological Well-Being*......................23

*Domestic Violence Arrest Policies by State* ....................................................................4

Elizabeth M. Whitehorn, Note, *Unlawful Evictions of Female Victims of Domestic Violence: Extending Title VII's Sex Stereotyping Theories to the Fair Housing Act* .............54

*HUD Final Rule, Implementation of the Fair Housing Act's Discriminatory Effects Standard* (2013) ........................................................................................................59

Robert Walker, TK Logan, Carol E. Jordan & Jacquelyn C. Campbell, *An Integrative Review of Separation in the Context of Victimization: Consequences and Implications for Women* .................................................................................................................23

Rudy Kleysteuber, *Tenant Screening Thirty Years Later: A Statutory Proposal to Protect Public Records*, 116 Yale L.J. 1344 (2007)..............................................................24

Sally F. Goldfarb, *Reconceiving Civil Protection Orders for Domestic Violence: Can Law Help End the Abuse Without Ending the Relationship?*, 29 Cardozo L. Rev. 1487 (2008)......................................................................................................................23

Sara K. Pratt, *U.S. Dep't of Hous. & Urban Dev., Office of Fair Hous. & Equal Opportunity, Assessing Claims of Housing Discrimination Against Victims of Domestic Violence under the Fair Housing Act and the Violence Against Women Act* (2011) (hereinafter "HUD Guidance") ...........................................................58, 59

*U.S. Dep't of Health & Human Services, National Intimate Partner and Sexual Violence Survey: 2010 Summary Report* (2011).......................................................................58

# I.    INTRODUCTION

This case arises from Defendants' serial enactment and enforcement of two virtually identical ordinances.  These ordinances penalize and coerce landlords in Norristown, Pennsylvania to pursue their tenants' evictions, when their tenants seek police assistance to protect them against incidents of domestic violence.

Plaintiff Lakisha Briggs ("Ms. Briggs") is an African-American, female victim of repeated domestic violence, who has periodically needed to seek police protection against domestic abuse at her rental home in Norristown.  Defendants – the Borough of Norristown ("Norristown" or "the borough"), its Former and Interim Municipal Administrator (David R. Forrest and Robert H. Glisson), Former and Interim Chief of Police (Russell J. Bono and Willie G. Richet), and Municipal Code Manager (Joseph E. Januzelli)[1] – have enacted and enforced two ordinances that authorize them to penalize landlords in Norristown, and cause those landlords to remove their tenants from their homes, where the tenants have required the assistance of law enforcement for incidents of "disorderly behavior" at their rental properties, including for incidents of domestic violence.

For nearly four years through November 2012, Defendants maintained and enforced Section 245-3 of the Norristown Municipal Code (the "Old Ordinance") against landlords and tenants in Norristown.  The Old Ordinance authorized Defendants ***to revoke or suspend a landlord's rental license and forcibly remove a tenant*** from any property where the police have responded to three instances of "disorderly behavior" at the property within a four-month period.  The Old Ordinance broadly defined "disorderly behavior" to cover any "activity

---

[1] In the Verified First Amended Complaint, Ms. Briggs asserts claims for damages arising from the injuries she suffered under the Old Ordinance against Defendants Norristown, Forrest, Bono and Januzelli.  Ms. Briggs asserts claims for declaratory and injunctive relief, seeking to preclude enforcement of the New Ordinance, against Defendants Norristown, Glisson, Richet and Januzelli.

that can be characterized as disorderly in nature" and provided several non-exclusive examples of activities that constituted "disorderly behavior," including instances of domestic violence.

Between April and September 2012, Defendants vigorously enforced the Old Ordinance against Ms. Briggs and her landlord by revoking her landlord's rental license and attempting to remove Ms. Briggs and her infant daughter from their home, on grounds that the police were called upon to protect her and her daughter from incidents of domestic violence too often. In the course of enforcing the Old Ordinance, Defendants assigned three "strikes" to Ms. Briggs and placed her property on a 30-day probationary period. During this probationary period, Ms. Briggs was so terrified she would lose her home due to Defendants' enforcement of the Old Ordinance that she refrained from calling the police during an incident in which she was brutally attacked and almost killed by her former boyfriend.

Notwithstanding this violent episode, Defendants proceeded undeterred to take steps to remove Ms. Briggs from her rental property until Plaintiff's counsel interceded. In a September 2012 letter, Plaintiff's counsel explained to Defendants how enforcement of the Old Ordinance violated several of Ms. Briggs' constitutional rights and demanded that Defendants cease enforcement of the Old Ordinance against Ms. Briggs and other tenants in Norristown. Following a meeting with Plaintiff's counsel, Defendants acknowledged the constitutional deficiencies of the Old Ordinance and subsequently repealed the Old Ordinance in its entirety, in November 2012. Yet, within two weeks after repealing the Old Ordinance, Defendants enacted a nearly identical, replacement ordinance (the "New Ordinance") in December 2012, without ever informing Plaintiff's counsel.

The New Ordinance is substantially similar to the Old Ordinance in all material respects. The New Ordinance permits Defendants ***to assess a series of escalating criminal fines***

***against landlords*** of any property at which, within a four-month period, the police have responded to three instances of "disorderly behavior," including instances of domestic violence. While the New Ordinance changes the penalties imposed on landlords for violations (from a suspension or revocation of rental licenses to a series of criminal fines), the New Ordinance has the same direct, adverse impact as the Old Ordinance on tenants in Norristown and continues to suffer from all of the same constitutional and legal failings.  Although the nominal targets of the New Ordinance are landlords, the New Ordinance directly infringes on the constitutional rights of tenants in Norristown.

As discussed herein, Defendants' enforcement of the Old Ordinance violated, and their threatened enforcement of the New Ordinance continues to violate, Ms. Briggs' fundamental, constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, their Pennsylvania constitutional equivalents, and federal statutory law.  In support of their Motion to Dismiss, Defendants rely on several misstatements of fact, mischaracterizations of the pleadings, and various inapposite cases.  Far from supporting any of Defendants' arguments, applicable case law demonstrate that Ms. Briggs has alleged more than sufficient facts to support her damages claims and her request for declaratory and injunctive relief.  Accordingly, the Court should deny the Motion to Dismiss.

## II.      STATEMENT OF FACTS

### A.      <u>The Old Ordinance</u>

Between January 5, 2009 and November 7, 2012, Norristown maintained the Old Ordinance, which authorized Norristown's Municipal Administrator to revoke or suspend the rental license for any property where the police have responded to three instances of "disorderly behavior" at the property within a four-month period.  Ver. First Am. Compl. ¶ 39; Section 245-

3 of the Norristown Municipal Code, Exhibit A to the Ver. First Am. Compl.  The Old

Ordinance defined "disorderly behavior" to mean "[a]ny call to a rental dwelling unit or units to

which the Norristown Police Department responds, and which, in the sole discretion of the Chief

of Police, involves activity that can be characterized as disorderly in nature."  *Id.*; Section 245-3

of the Norristown Municipal Code, Exhibit A to the Ver. First Am. Compl.  The Old Ordinance

provided seven non-exclusive examples of what activity constituted "disorderly behavior,"

including any "[d]omestic disturbances that do not require that a mandatory arrest be made."[2]  *Id.*

For each incident of "disorderly behavior," landlords and their tenants were assigned a "strike."

*Id.*

   While the Old Ordinance purported to provide two exceptions to its enforcement

for calls seeking "emergency assistance," a plain reading of the relevant language reveals that

these supposed "exceptions" were devoid of meaning.  *Id.* ¶ 40.  First, the "exceptions" only

exempted emergency calls made by "a tenant, a member of a tenant's family or a tenant's guest"

and, thus, did not include calls for emergency assistance or otherwise by neighbors or any others

outside the rental property.  *Id.*  Second, one of the "exceptions" did not apply if it was later

determined, in the unilateral discretion of the Norristown Police Department, that any acts of

"disorderly behavior" (as defined in the Old Ordinance) had occurred at the property.  *Id.*  Third,

the other "exception" only excused such calls seeking "emergency assistance that is protected by

Pennsylvania statute."[3]  *Id.*  The emptiness of these supposed "exceptions" was borne out by

---

[2] Unlike other states, Pennsylvania does not have a mandatory arrest statute for domestic violence crimes. *See* Am. Bar. Assoc. Comm'n on Domestic Violence, *Domestic Violence Arrest Policies by State*, *available at* http://www.americanbar.org/content/dam/aba/migrated/domviol/docs/Domestic_Violence_Arrest_Policies_by_State_11_07.authcheckdam.pdf (comparing Pennsylvania's domestic violence policy to policies of other states and noting that Pennsylvania arrest policy is according to "Officer's Discretion") (attached hereto as Exhibit 1).  The only mandatory arrest provision in the law relating to domestic violence is in the Protection from Abuse Act, 23 Pa. Cons. Stat. § 6113(a), which applies to specific violations of Protection from Abuse orders.

[3] Plaintiff's counsel are not aware of any applicable Pennsylvania statutes.

Defendants' enforcement of the Old Ordinance against Ms. Briggs when the police were called to respond to emergency situations at her property and to protect her from incidents of domestic violence, as discussed below.  *Id.* ¶ 41.

Although the nominal targets of the Old Ordinance were landlords, the Old Ordinance had several direct, adverse effects on Ms. Briggs and other victims of domestic violence in Norristown.  *Id.* ¶ 43.  The Old Ordinance stripped domestic violence victims – some of the most vulnerable citizens in the community – of police protection, silenced them from reporting acts of violence against them, and emboldened their abusers to perpetrate their acts of violence in the home.  *Id.*  Under the Old Ordinance, victims of domestic violence were essentially forced to choose between eviction and calling for help when they were being battered in their homes.  *Id.*  The Old Ordinance also exacerbated the preexisting challenges that victims of domestic violence already face in accessing and maintaining housing.  *Id.*  It is well-documented that domestic violence is a primary cause of homelessness and housing instability for women and children.  *Id.*

## B.    Episodes Of Domestic Violence

Between November 1, 2010 and February 1, 2013, Ms. Briggs rented a house with a Section 8  voucher on Wayne Avenue in Norristown ("the Property") from her landlord, Darren Sudman ("Mr. Sudman").  *Id.* ¶¶ 46-47.  While living at the Property, Ms. Briggs experienced several incidents of domestic violence in which the police were called.  *Id.* ¶ 48.

### 1.    Early Incidents

Between January and March 2012, Ms. Briggs called the police four times for assistance with domestic disturbances.  *Id.* ¶ 49.  The police responded to all four of these calls, but did not inform Ms. Briggs of the Old Ordinance and did not tell her that any of the calls would count as a strike.  *Id.* ¶ 50.

### 2.     April 9, 2012 Incident

On or about April 9, 2012, Ms. Briggs' boyfriend at the time, Wilbert Bennett ("Wilbert"), came to her home around 2:00 a.m. and tried to wake her up.  *Id.* ¶ 51.  He was intoxicated.  *Id.*  Wilbert and Ms. Briggs began arguing, and Wilbert hit her.  *Id.* ¶ 52. Ms. Briggs' 21 year old daughter, who was at the Property at the time, called the police.  *Id.* ¶ 53. When the police arrived, they arrested Wilbert and charged him with disorderly conduct, public drunkenness, and possession of marijuana.  *Id.*

The police did not charge Ms. Briggs with a crime, issue a citation or accuse her of any violation of law.  *Id.* ¶ 54.  This was the first occasion that the police informed Ms. Briggs about the Old Ordinance and warned her that this incident of domestic violence was her first strike.  *Id.* ¶ 55.  The police told her that they were charging her with a strike under the Old Ordinance because they were tired of responding to Ms. Briggs' previous calls to the police.  *Id.* The police officer who told her about the Old Ordinance said:  "You are on three strikes.  We're gonna have your landlord evict you."  *Id.* ¶ 56.

Following this incident, Ms. Briggs had a lengthy discussion with members of her family and Wilbert regarding the Old Ordinance.  *Id.* ¶ 57.  She told them that any "disorderly behavior" could get her evicted under the Old Ordinance.  *Id.*  She told them that it would be terrible if she got evicted, and that she needed to keep the rental house to raise her three year old daughter.  *Id.*

### 3.     April 15, 2012 Incident

Just six days later, on or about April 15, 2012, Wilbert and members of Ms. Briggs' family were at Ms. Briggs' home for a barbeque.  *Id.* ¶ 58.  A fight arose between Wilbert and the boyfriend of Ms. Briggs' 21 year old daughter.  *Id.* ¶ 59.  None of the individuals

from Ms. Briggs' home called the police for fear of incurring a second strike.  *Id.* ¶ 60.  Instead, a neighbor called the police.  *Id.* ¶ 61.

Upon arrival, the police entered the house with guns drawn because it was reported – erroneously – that shots had been fired.  *Id.*  The police arrested Wilbert and Ms. Briggs' 21 year old daughter's boyfriend and charged them with simple assault and reckless endangerment.  *Id.* ¶ 62.  The police officers did not mention the Old Ordinance or any strikes at that time.  *Id.* ¶ 63.  However, Ms. Briggs' landlord later received a notice in the mail indicating that this incident constituted a second strike against Ms. Briggs.  *Id.* ¶ 64.

Following the April 15 incident, Ms. Briggs broke up with Wilbert and told him that he could no longer stay at or even visit her home.  *Id.* ¶ 66.  Ms. Briggs wanted everyone out of her home, except for her three year old daughter.  *Id.* ¶ 67.  She did not want to do anything to risk losing her home.  *Id.*

### 4.    May 2, 2012 Incident

Two and a half weeks later, on or about May 2, 2012, Ms. Briggs returned home from work and saw Wilbert in an alleyway near her house, drinking and talking with some unknown individuals.  *Id.* ¶ 68.  Wilbert chased Ms. Briggs down the alley with a brick and followed her to her house, where he attacked her.  *Id.* ¶ 69.  An unknown person called the police.  *Id.* ¶ 70.  When the police arrived at her house, Wilbert ran into the house to hide from the police.  *Id.*  Ms. Briggs remained on the porch in only her bra; her shirt had been ripped off by Wilbert during the struggle.[4]  *Id.* ¶ 71.

Notwithstanding the obvious appearance of being assaulted, Ms. Briggs declined to tell the police what had happened and told them that there was no one in the house.  *Id.* ¶ 72.

---

[4] The May 2, 2012 Norristown Police Department Arrest Report, attached as Exhibit 5 to Defendants' Response Brief at N000008, incorrectly states that Ms. Briggs "had taken her shirt off."

She was reluctant to tell the police the truth for fear that it could lead to a third strike under the Old Ordinance.  *Id.*  When the police asked if they should remove Wilbert from the house, Ms. Briggs declined because she was worried about eviction under the Old Ordinance.  *Id.* ¶ 73.  The police eventually entered the house and arrested Wilbert.  *Id.* ¶ 74.  Wilbert was charged with public drunkenness, and both Ms. Briggs and Wilbert were cited for disorderly conduct and fighting.  *Id.*

For each of the April 9, April 15, and May 2, 2012 incidents, the police charged Ms. Briggs with a strike under the Old Ordinance.  *Id.* ¶ 75.  The borough then initiated license-revocation proceedings against Ms. Briggs' landlord.  *Id.*

## C.   **Meeting With Borough Officials**

On or about May 23, 2012, Ms. Briggs accompanied her landlord, Mr. Sudman, to a meeting with borough officials, regarding whether Mr. Sudman's license for the property on Wayne Avenue should be suspended or revoked and whether Ms. Briggs could continue to live in the house.  *Id.* ¶ 76.  In attendance at the meeting were Defendants Forrest, Bono, and Januzelli, and Norristown's Solicitor, Sean Kilkenny, Esq.  *Id.* ¶ 77.  The meeting lasted approximately 30 minutes.  *Id.* ¶ 78.  No official record, transcript or minutes were kept and no one appeared to be designated as a finder of fact.  *Id.*

Defendant Bono did most of the talking at the meeting, reporting what was recorded in the police reports.  *Id.* ¶ 79.  Ms. Briggs attempted to tell her side of the story and describe the incidents, but she was interrupted by Defendant Bono's statements that the police had responded to a call, and that one of the callers had claimed – erroneously – that shots had been fired at the house.  *Id.* ¶ 80.  Defendant Bono also made specious allegations of drug-related activity at the house.  *Id.*

-8-

Mr. Sudman also spoke at the meeting and described Ms. Briggs as a good tenant who paid her rent in a timely manner. *Id.* ¶ 81. He explained that he had never had a problem with Ms. Briggs. *Id.* Mr. Sudman added that it would be a significant loss for him to lose Ms. Briggs as a tenant and noted that it would be an even greater loss for Ms. Briggs to lose her home because she had a three year old child to care for. *Id.* ¶ 82. Ms. Briggs brought a friend, Dana Henderson, to support her at the meeting, but Ms. Henderson was not permitted to speak. *Id.* ¶ 83.

Later the same day, Defendant Forrest issued a letter decision and placed the property on a 30-day probationary period. *Id.* ¶ 84. Defendant Forrest declared in his letter decision that any further violations during the 30-day period would result in suspension or revocation of the rental license. *Id.* ¶ 85. Thus, through this letter as well as their previous communications, Defendants affirmatively instructed Ms. Briggs that any future calls to the police would lead to her eviction. *Id.* ¶ 86.

**D.    June 23, 2012 Incident**

Wilbert was incarcerated for a brief period of time as a result of the May 2nd incident. *Id.* ¶ 87. However, Wilbert was released from prison around the middle of June 2012 and went to find Ms. Briggs at her house. *Id.* ¶ 88. Wilbert wanted to get back together. *Id.* ¶ 89. He threatened Ms. Briggs: "You are going to be with me or you are going to be with no one." *Id.*

Ms. Briggs told Wilbert that she did not want to be with him anymore, but Wilbert would not accept her decision and refused to leave. *Id.* ¶ 90. Ms. Briggs could not physically force him by herself to leave and knew that she could not call on the police to remove him without violating the probationary period and facing eviction under the Old Ordinance. *Id.* ¶ 91. Left powerless, Ms. Briggs acquiesced to Wilbert's demands. *Id.* ¶ 92. She let her abuser

stay because she felt intimidated and worried that he would harm her or her three year old daughter if she tried to do anything to force him out, and she knew that she could not call the police for help without risking eviction.  *Id.*

On or about the evening of June 23, 2012, Wilbert invited some of his friends over to Ms. Briggs' house.  *Id.* ¶  93.  Powerless to prevent Wilbert's and his friends' intrusion without calling the police, Ms. Briggs let them stay.  *Id.* ¶ 94.  She could not call the police without violating the Old Ordinance.  *Id.*

Later that evening, Wilbert attacked Ms. Briggs for allegedly flirting with other men.  *Id.* ¶ 95.  He bit and tore her lip.  *Id.* ¶ 96.  He broke a glass ashtray against the right side of her head, knocking her down and leaving a two-inch gash.  *Id.* ¶ 97.  He stabbed her in the neck with one of the large broken glass shards.  *Id.* ¶ 98.  Ms. Briggs ultimately passed out, with blood gushing from a four inch long puncture wound in her neck.  *Id.* ¶ 99.

Ms. Briggs did not call the police for fear of triggering her eviction under the Old Ordinance; a neighbor called the police.  *Id.* ¶ 100.  Ms. Briggs was quickly flown by trauma helicopter to the University of Pennsylvania Hospital for emergency medical care.  *Id.* ¶ 101. Wilbert later turned himself in to authorities and was held on aggravated assault charges.[5]  *Id.* ¶ 102.  Ms. Briggs subsequently obtained a Protection from Abuse ("PFA") restraining order against Wilbert on July 12, 2012, which expires on July 11, 2015.  *Id.* ¶ 103.

---

[5] Defendants' unsupported statements that the incidents to which the police responded to Ms. Briggs' home between April and June 2012 did not involve domestic violence are factually incorrect.  Each of the April 9, April 15, May 2, June 23 incidents, for which Ms. Briggs was penalized by receiving a strike (or the threatened revocation of her landlord's rental license), involved physical abuse by her former boyfriend.  Any of the Norristown police officers' failures to record the clear bodily injuries to Ms. Briggs and others in her home and the obvious signs of domestic violence in each incident are, at best, administrative failings on the part of the police and certainly do not support Defendants' claim that those incidents did not involve domestic violence.

E.   __Eviction Proceedings__

Three days after the stabbing incident, on or about June 26, 2012, Defendant Forrest told Mr. Sudman that his rental license was revoked and that Ms. Briggs had ten days to vacate the property.  *Id.* ¶ 104.  However, Defendant Forrest told Mr. Sudman that he could apply for a new rental license as soon as Ms. Briggs vacated the property.  *Id.* (citing June 26, 2012 email chain, Exhibit D to the Ver. First Am. Compl.).

Ms. Briggs had just returned home from the hospital after being treated for the stabbing incident.  *Id.* ¶ 105.  It was the middle of her pay period and she did not have the money to go anywhere else.  *Id.*  Mr. Sudman told Ms. Briggs that the borough was, unfortunately, forcing him to file for her eviction.  *Id.* ¶ 106.

### 1.   First Eviction Hearing

Ms. Briggs, her then-attorney Susan Strong, Esq., and Mr. Sudman attended the first eviction hearing before Magisterial District Justice Margaret Hunsicker.  *Id.* ¶ 107. Mr. Sudman told District Justice Hunsicker that he did not want to evict Ms. Briggs because she was a good tenant who paid her rent in a timely fashion, and was bringing the eviction action solely because he was required to do so by the borough.  *Id.* ¶ 108.  The Court issued a continuance and postponed its decision to give the borough some time to reconsider its decision. *Id.* ¶ 109.  Susan Strong communicated what had transpired at the eviction hearings to the borough.  *Id.* ¶ 110.

### 2.   Second Eviction Hearing – August 22, 2012

At the second eviction hearing, on or about August 22, 2012, District Justice Hunsicker ruled that Ms. Briggs could continue to live at the rental house if she paid her rent up through the end of August and Mr. Sudman's court filing fees relating to the eviction proceedings.  *Id.* ¶ 111.  Ms. Briggs promptly paid the required amounts and was, therefore,

entitled to remain in the property.  *Id.* ¶ 112.  Susan Strong communicated the outcome of the

hearing to Mr. Sudman and the borough.  *Id.* ¶ 113.

     **F.**      **Subsequent Attempts to Remove Ms. Briggs**

     Despite District Justice Hunsicker's ruling, the borough continued to pursue the

removal of Ms. Briggs from her home.  *Id.* ¶ 114.  On or about August 27, 2012, Defendant

Forrest told Mr. Sudman that – based on advice of counsel and notwithstanding the U.S.

Constitution, applicable federal law and District Justice Hunsicker's decision – the borough had

an "independent right" under the Old Ordinance to revoke his rental license, condemn the

property as "unlawful," and remove Ms. Briggs for trespassing.  *Id.* ¶ 115.  Accordingly, the

borough strongly recommended that Mr. Sudman encourage Ms. Briggs to vacate the property

voluntarily.  *Id.* (citing August 27, 2012 email from D. Forrest to D. Sudman, Exhibit E to the

Ver. First Am. Compl.).

     **G.**      **Notice of Constitutional Violations Under the Old Ordinance**

     Ms. Briggs, through her undersigned counsel, sent Defendants a letter on

September 10, 2012 notifying Defendants of the unconstitutionality of Defendants' actions under

the Old Ordinance and demanding that Defendants cease enforcement of the Old Ordinance

against Ms. Briggs and other tenants in Norristown.  *Id.* ¶ 116 (citing September 10, 2012 letter,

Exhibit F to the Ver. First Am. Compl.).  The September 10, 2012 letter also outlined the

numerous constitutional problems associated with enforcement of the Old Ordinance and pointed

out that the Old Ordinance violated the First, Fourth, Fifth, and Fourteenth Amendments to the

U.S. Constitution and their Pennsylvania equivalents, as well as federal and state statutory law.

*Id.* ¶ 117.

     Plaintiff's counsel later met with Defendants and Defendants' counsel on

September 19, 2012 to discuss the constitutional concerns described in the September 10, 2012

letter.  *Id.* ¶ 118.  At this meeting, Defendants appeared to acknowledge the constitutional

failings of the Old Ordinance.  *Id.* ¶ 119.  Following this meeting, Defendants agreed to five

demands by Plaintiff's counsel, including a repeal of the Old Ordinance:

a. First, Norristown agreed to cease any enforcement activities against Ms. Briggs under the Old Ordinance.  Ms. Briggs would be free to call the Norristown Police Department without fear of eviction.  Ms. Briggs would also not risk a strike or eviction if a neighbor or another person called the Norristown Police Department concerning Ms. Briggs' property.  *Id.* ¶ 120(a) (citing October 25, 2012 email chain, Exhibit G to the Ver. First Am. Compl.).

b. Second, Norristown agreed to cease any enforcement activities against Ms. Briggs' landlord, Darren Sudman, under the Old Ordinance.  Norristown would restore Mr. Sudman's rental license in full.  *Id.* ¶ 120(b).

c. Third, Norristown agreed to suspend any enforcement of the Old Ordinance against any individuals (landlords or tenants) pending re-evaluation of the Old Ordinance by the Norristown Municipal Council.  *Id.* ¶ 120(c).

d. Fourth, Norristown agreed to restore, where possible, the pre-enforcement positions of recently affected individuals (landlords or tenants).  *Id.* ¶ 120(d).

e. Fifth, Norristown agreed to take steps to repeal the Old Ordinance in its entirety.  *Id.* ¶ 120(e).

Plaintiff's counsel subsequently attempted to memorialize an agreement on these

points with Defendants on October 25, 2012 in a written settlement agreement.  *Id.* ¶ 121.

However, Defendants, through their counsel, rejected Plaintiff's counsel's proposed settlement

agreement and refused to enter into any written settlement agreement.  *Id.* ¶ 122.

Defendants subsequently repealed the Old Ordinance on November 7, 2012 by

enacting Ordinance No. 12-11.  *Id.* ¶ 123.  In enacting Ordinance No. 12-11, the Norristown

Municipal Council gave two reasons for repealing the Old Ordinance.  First, the Council

acknowledged that the Old Ordinance resulted "in the deprivation of property rights for tenants

without due process in violation of the 5th and 14th Amendments to the U.S. Constitution and

other federal and state statutes."  *Id.* ¶ 124 (citing Ordinance No. 12-11, Exhibit H to the Ver.

First Am. Compl.).  Second, a repeal of the Old Ordinance was "in the best interests of protecting the rights of the residents of Norristown."  *Id.*

    **H.**    **The New Ordinance**

        Notwithstanding Norristown's admissions above in repealing the Old Ordinance, Defendants immediately began the process for introducing a proposed ordinance to re-enact the Old Ordinance in a "new" form.  *Id.* ¶ 125.  On November 20, 2012, at the very next meeting of the Norristown Municipal Council following the repeal of the Old Ordinance, the Norristown Municipal Council introduced a proposed ordinance, "amending the 3-strikes ordinance."  *Id.* ¶ 126 (citing November 20, 2012 Municipal Council minutes, Exhibit I to the Ver. First Am. Compl.).  Defendants did not notify Ms. Briggs or her counsel of the process or of their plan to enact this new ordinance immediately following the repeal of the Old Ordinance.  *Id.* ¶ 127.

        At the following meeting of the Norristown Municipal Council on December 4, 2012, Defendants enacted Ordinance No. 12-15 (the "New Ordinance"), to replace former Section 245-3 of the Norristown Municipal Code.  Ver. First Am. Compl. ¶ 128 (citing Ordinance No. 12-15, Exhibit J to the Ver. First Am. Compl.).  The New Ordinance permits Norristown's Municipal Administrator to assess a series of daily, escalating criminal fines against landlords of any property where the police have responded to three instances of what the Chief of Police – in his sole discretion – considers "disorderly behavior" at the property within a four month period, including any "[d]omestic disturbances that do not require that a mandatory arrest be made."[6] *Id.* ¶ 129.

        The New Ordinance is substantially similar to the Old Ordinance in its direct, adverse impact on tenants in Norristown and is plagued by the same constitutional and legal

---

      [6] Again, Pennsylvania does not have a mandatory arrest provision in the law for domestic violence crimes.

deficiencies.  *Id.* ¶ 130 (citing Blackline Comparison of the Old Ordinance and the New Ordinance, Exhibit K to the  Ver. First Am. Compl.).  Whereas the Old Ordinance permitted Norristown to revoke or suspend a landlord's rental license, the New Ordinance allows Norristown to impose criminal fines on landlords for the alleged "disorderly behavior" of a landlord's tenants.  *Id.* ¶ 131.

      Like its predecessor, the New Ordinance:  (a) gives the Chief of Police the authority and unfettered discretion to determine what "disorderly behavior" is and whether a landlord's tenants or guests have engaged in such "disorderly behavior"  (Section (B)(2), Ordinance No. 12-15); (b) broadly defines "disorderly behavior" as conduct that "involves activity that can be characterized as disorderly in nature," including "[d]omestic disturbances that do not require that a mandatory arrest be made"  (Section (B)(2)(e), Ordinance No. 12-15); (c) imposes a penalty on landlords where three instances of "disorderly behavior" have occurred at a property within a four month period (Section C-E, Ordinance No. 12-15); and (d) provides a hollow exception for calls seeking "emergency assistance" (Section B(4), Ordinance No. 12-15). *Id.* ¶ 132.

      Unlike its predecessor, however, the New Ordinance goes further to penalize landlords and adversely impact tenants by: (i) encouraging landlords to "include in their leases language that provides that it is a breach of the lease for a tenant to be convicted for disorderly behavior" (Section I, Ordinance No. 12-15); and (ii) subjecting landlords to criminal penalties according to a graduating series of fines for each instance of "disorderly behavior" that occurs at a landlord's rental property, where "[e]ach day that a violation continues [] constitute[s] a separate offense" (Section K, Ordinance No. 12-15).  *Id.* ¶ 133.

Although the fifth recital of the New Ordinance states that the "Municipal Council desires that no . . . landlord [shall be] criminally responsible for the acts of their tenants," subsections D, E, and K expressly provide that a landlord shall be subject to criminal fines up to $1,000 per day for each incident of "disorderly behavior" of their tenants.  *Id.* ¶ 134 (citing Ordinance No. 12-15, Exhibit J to the Ver. First Am. Compl.).  While the language of subsections D and E requires the landlord to pay the applicable fines "if found guilty by a court of competent jurisdiction," the New Ordinance does not provide any method for a tenant to challenge the Chief of Police's unilateral determination that conduct at his or her rental property constituted "disorderly behavior."  *See* Ordinance No. 12-15, Exhibit J to the Ver. First Am. Compl.

Although subsection H of the New Ordinance provides that "[n]o tenant shall be evicted or forced to vacate a rental dwelling unit by the Municipality of Norristown for violation of the provisions of Ordinance," subsection F expressly provides that "adverse action may be taken [against a landlord] when the [landlord] fails to diligently pursue the eviction process."  *Id.* ¶ 135.  Similarly, subsection I states that "[i]t is strongly encouraged that all [landlords] include in their leases language that provides that it is a breach of the lease for a tenant to be convicted for disorderly behavior."[7]  *Id.*

Notwithstanding the shift from suspending or revoking landlords' rental licenses to imposing criminal fines on landlords, the New Ordinance continues to suffer from the same constitutional and legal failings as its predecessor.  *Id.* ¶ 136.  Defendants have attempted to sidestep the constitutional concerns of the Old Ordinance by drafting the New Ordinance in a

---

[7] Although this language uses the word "convicted" in this context, there is no requirement that criminal charges be filed against a tenant or anyone else for the tenant to incur a "strike" under the New Ordinance.  All that is required under the New Ordinance is that the Chief of Police determines, in his sole discretion, that the behavior at the rental property is "disorderly."

way that:  (a) penalizes landlords with criminal fines for the alleged "disorderly behavior" of their tenants, instead of revoking or suspending their rental licenses; and (b) expresses Norristown's disinterest in evicting tenants but establishes a system by which landlords are obligated to take actions that Defendants have admitted would be unconstitutional if taken by them.  *Id.* ¶ 137.  Such cosmetic alterations do nothing to rescue the New Ordinance from the same constitutional and legal failings that plagued the Old Ordinance.  *Id.* ¶ 138.

### I.    The New Ordinance Continues to Violate Ms. Briggs' Constitutional Rights

Ms. Briggs continues to fear that contacting the police for any reason will once again place her at risk of losing her home, even when she calls the police to protect her physical safety.  *Id.* ¶ 139.  This fear was exacerbated when, on December 7, 2012, only a few days after the New Ordinance was enacted, Ms. Briggs learned that Norristown would be inspecting her home at the Property, without her consent, on December 11, 2012 as part of Norristown's new program of "random inspections" of rental units throughout the borough.[8]  *Id.* ¶ 140.

On information and belief, the proposed inspection of Ms. Briggs' home was not random; rather, Norristown officials had affirmatively selected her home for inspection.  *Id.* ¶ 141.  Plaintiff's counsel sent Defendants' counsel a December 8, 2012 email objecting to and challenging the legality of Norristown's planned inspection of Ms. Briggs' home.  *Id.* ¶ 142 (citing December 10, 2012 email chain, Exhibit L to the Ver. First Am. Compl.).  While Defendants then agreed not to inspect Ms. Briggs' home at that time, they have not indicated that they will not attempt to do so in the future.  *Id.* ¶ 143.

---

[8] Plaintiff's counsel is not aware of any ordinance authorizing such a program of "random inspections" of rental units throughout the borough.

J.    **The New Rental Property**

On February 1, 2013, Ms. Briggs and her three year old daughter moved from the Property to another location in Norristown, where she rents a house with a Section 8 voucher. *Id.* ¶ 144.  Even at her new home, Ms. Briggs continues to fear that contacting the police for any reason may place her at risk of losing her home.  *Id.* ¶ 146.  For example, on or about April 5, 2013, Ms. Briggs heard gun shots in her neighborhood and saw the gunman run through her backyard.  Compl ¶ 147.  She did not call the police to report this information for fear that it could lead to her eviction.  *Id.*

Defendants have not advised Ms. Briggs or her new landlord that Defendants consider the New Ordinance invalid or illegal, or that it will not be applied against them.  *Id.* ¶ 148.  Defendants' enforcement of the Old Ordinance against Ms. Briggs, their feigned repeal of the Old Ordinance, and their actions in enacting the New Ordinance continue to cause an undue chilling effect on the exercise of Ms. Briggs' First Amendment rights and her ability to seek the assistance of law enforcement.  *Id.* ¶ 149.

## III.    ARGUMENT

### A.    Standard of Review

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the nonmoving party."  *See generally Atl. Pier Assocs., LLC v. Boardakan Rest. Partners*, 647 F. Supp. 2d 474, 483 (E.D. Pa. 2009) (discussing the standard for review on motion to dismiss) (Robreno, J.) (quoting *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 215 (3d Cir. 2007)).  While a court need not "credit either bald assertions or legal conclusions," a motion to dismiss should be denied where the factual

allegations in the complaint "raise the right to relief above the speculative level." *See id.*

(quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) and *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007)).

      As discussed below, Ms. Briggs has alleged more than sufficient facts in the

Verified First Amended Complaint to support her claims that Defendants' enforcement of the

Old Ordinance violated, and their threatened enforcement of the New Ordinance continues to

violate, her fundamental rights under the First, Fourth, and Fourteenth Amendments to the

United States Constitution, their Pennsylvania constitutional equivalents, and federal statutory

law.

      In their Response to Plaintiff's Motion for Preliminary Injunction ("Defendants'

Response Brief") and Memorandum of Law in Support of Defendants' Motion to Dismiss

("Defendants' Motion to Dismiss Brief"), Defendants have misrepresented or mischaracterized

the facts alleged in the Verified First Amended Complaint and have asserted several "facts"

beyond the scope of the Verified First Amended Complaint that are patently false.  Defendants

have not provided the Court with any support for their numerous unfounded factual statements.

By way of example, Defendants' assert on page 9 of their Response Brief that Ms. Briggs is

"hid[ing] behind the shield of the First Amendment in order to commit crimes."  Such inaccurate

and inappropriate statements of fact by Defendants must be disregarded when evaluating the

present motion to dismiss.  *See, e.g., W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 97

n.6 (3d Cir. 2010) (holding that "a district court ruling on a motion to dismiss may not consider

matters extraneous to the pleadings" and criticizing district court for relying "heavily on

evidence extrinsic to the complaint" (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d

1410, 1426 (3d Cir. 1997)) (internal quotation marks omitted)).

   **B.    The Old Ordinance Violated and the New Ordinance Continues to
          Violate Ms. Briggs' Right to Petition the Government for Redress of
          Grievances as Protected by the First Amendment to the United States
          Constitution.**

          Contrary to the arguments asserted by Defendants in their Response Brief, which

Defendants incorporate by reference in their Motion to Dismiss Brief, Defendants' enactment

and enforcement of the Old and New Ordinances have caused and continue to cause an undue

chilling effect on Ms. Briggs' fundamental, constitutional right to seek the assistance of law

enforcement.

          **1.    The Law Is Clear that Ms. Briggs Has a First Amendment
                  Right to Seek the Assistance of Law Enforcement.**

          As discussed on pages 20 through 21 of the Memorandum of Law in Support of

Plaintiff Lakisha Briggs' Motion for Preliminary Injunction (the "Memorandum") (Docket No.

2), Ms. Briggs unquestionably has a constitutional right to seek the assistance of law

enforcement under the First Amendment's right to petition clause.  Defendants' assertions to the

contrary are not supported by applicable case law.

          Rather than addressing any of the legion case law cited by Ms. Briggs in the

Memorandum, Defendants cite and attempt to analogize two inapposite cases holding that the

substantive due process clause of the Fourteenth Amendment does not provide individual

citizens with an affirmative right to receive emergency rescue services, *White v. City of

Philadelphia*, 118 F. Supp. 2d 564, 568 (E.D. Pa. 2000) ("State actors do not have an affirmative

obligation to protect individual citizens from private violence."), and holding that an individual

does not have a First Amendment right to direct the prosecution or non-prosecution of another,

*Guarrisi v. Gibbons*, Civ. Action No. 07-5475, 2008 U.S. Dist. LEXIS 81632, at *32, 2008 WL

4601903, at *9 (E.D. Pa. Oct. 15, 2008) (holding that an individual does not have "a judicially

cognizable interest in the prosecution or nonprosecution [sic] of another").

These cases cited by Defendants are inapposite because Ms. Briggs is not claiming that she is entitled to emergency rescue services or that she has a right to control any criminal prosecution.  Rather, Ms. Briggs claims that Defendants' enforcement of the Old Ordinance against her and enactment of the New Ordinance have chilled her from contacting the police to *request* emergency assistance or to *report* incidents of domestic violence or criminal activity, in violation of her First Amendment right to petition.  *See, e.g., Meyer v. Bd. of County Comm'rs*, 482 F.3d 1232, 1243 n.5 (10th Cir. 2007) (rejecting defendants' mischaracterization of plaintiff's claim as seeking to direct "the criminal prosecution of another," and holding that anyone has "the right to present a criminal complaint, which is a form of the right to petition for redress of grievances") (internal citations omitted).

Defendants' reliance on *Borough of Duryea v. Guarnieri*, __ U.S. __, 131 S. Ct. 2488 (2001), and attempt to carve out a "personal use" exception to the protections afforded by the First Amendment's right to petition clause similarly misses the mark.  Contrary to Defendants' assertion that the right to petition does not apply to Ms. Briggs' alleged "purely personal" use of 911 to call the police, *Guarnieri* expressly holds:  "The Petition Clause undoubtedly does have force and application in the context of a ***personal grievance*** addressed to the government. . . . At the founding, citizens petitioned on a wide range of subjects, including matters of both private and public concern.  Petitions to the colonial legislatures concerned topics as diverse as debt actions, estate distributions, divorce proceedings, and requests for modification of a criminal sentence."  *See Guarnieri*, 131 S. Ct. at 2498 (internal citations omitted) (emphasis added).  Moreover, Defendants' argument suggests that they view domestic violence as a "personal" matter, not a criminal issue worthy of police response.  This view was rejected long ago by law enforcement agencies, legislatures, and courts as our society has worked toward

ending such violence, and does not in any way limit Ms. Briggs' First Amendment right to petition asserted here.

> ### 2. The Old Ordinance Caused and the New Ordinance Causes a Concrete, Tangible and Ongoing Chilling Effect on Ms. Briggs' First Amendment Rights.

As discussed on pages 22 through 24 of the Memorandum, the Old Ordinance caused and the New Ordinance causes a current, real and palpable chilling effect on Ms. Briggs' First Amendment right to petition by contacting the police to report incidents of domestic violence. Defendants' unsupported assertion – that Ms. Briggs' fear to contact the police is purely subjective and not credible – is belied by the facts verified by Ms. Briggs in the Verified First Amended Complaint and itself defies credulity.

Defendants vigorously enforced the Old Ordinance against Ms. Briggs and her landlord for making calls to the police for incidents of domestic violence at her property. The first time Defendants assigned a strike to Ms. Briggs, the Norristown police specifically told her: "You are on three strikes. We're gonna have your landlord evict you." Ver. First Am. Compl. ¶ 56. With each subsequent strike, she grew increasingly fearful to contact the police for any reason, because she knew that it could lead to her eviction. *Id.* ¶¶ 57, 60, 72, 92, 100. She even declined to call the police when she was brutally attacked and almost killed by her former boyfriend in June 2012. *Id.* ¶ 100. Shortly after she returned home from the hospital after that horrific experience, Defendants forced Ms. Briggs' landlord to pursue her eviction under the Old Ordinance.[9] *Id.* ¶ 72.

---

[9] Defendants fault Ms. Briggs for not obtaining a Protection from Abuse ("PFA") restraining order against her former boyfriend until July 2012, three weeks after the short timeline they set for her. This argument engages in the same victim-blaming that seems to motivate the New Ordinance. Defendants should not be dictating the timing of when, or even whether, a victim seeks a PFA order. There are good reasons why a victim chooses not to seek such a restraining order, or is delayed in obtaining one, including her own safety. *See generally* Brief *Amicus Curiae* of the Pennsylvania Coalition Against Domestic Violence, et al., in Support of Plaintiff's Motion for Preliminary Injunction, at 18-20 (Docket No. 35) (hereinafter "PCADV Amicus Brief") (explaining why

Although Defendants subsequently decided in September 2012 not to continue to pursue Ms. Briggs' eviction,[10] and ultimately agreed in November 2012 that they would not enforce the Old Ordinance against Ms. Briggs or her landlord (after Ms. Briggs' counsel intervened), Defendants specifically refused to enter into a settlement agreement at that time and quickly replaced the Old Ordinance with the New Ordinance (which is virtually identical in all material respects to its predecessor) without ever notifying Ms. Briggs' counsel. *Id.* ¶¶ 120-28.

Ms. Briggs' fear to call the police was further exacerbated when Defendants threatened to conduct a "random inspection" of her rental home, without her consent, which upon information and belief was designed to intimidate Ms. Briggs from taking any action to impede Defendants' ability to enforce the New Ordinance. *Id.* ¶ 140.  Even though Defendants

---

Norristown's requirement that Ms. Briggs obtain a PFA "goes beyond what an individual can reasonably be required to do," further explaining that such a "directive is both contradictory to existing law and dangerous for Ms. Briggs and others within Norristown's jurisdiction who may be similarly situated or who may be caught in the cross-fire of retaliatory violence.").

When a domestic violence victim applies for and obtains a restraining order, she is likely to face heightened risk from a perpetrator.  That is because "[w]omen are most at risk after ending, or while trying to end, an abusive relationship," as batterers often take retaliatory actions to maintain their power and control over victims.  *See, e.g.,* Sally F. Goldfarb, *Reconceiving Civil Protection Orders for Domestic Violence: Can Law Help End the Abuse Without Ending the Relationship?*, 29 Cardozo L. Rev. 1487, 1520 (2008); Deborah K. Anderson & Daniel G. Saunders, *Leaving an Abusive Partner: An Empirical Review of Predictors, the Process of Leaving, and Psychological Well-Being*, 4 Trauma, Violence & Abuse 163, 179 (2003) (reporting that 24% to 35% of women who leave abusive relationships experience more severe abuse after separation); Robert Walker, TK Logan, Carol E. Jordan & Jacquelyn C. Campbell, *An Integrative Review of Separation in the Context of Victimization: Consequences and Implications for Women*, 5 Trauma, Violence & Abuse 143, 158-60 (2004) (reporting that psychological abuse was experienced by 95% of women after separating from their abusive relationships while 39% percent experienced continued physical abuse).  For that reason, the decision about whether and when to seek a restraining order should be the victim's alone; only she can best determine what will ensure her safety.  In any case, Ms. Briggs did obtain a PFA order when it became feasible for her to do so, only three weeks after Defendants' arbitrary deadline.  Even after she obtained a PFA order against her former boyfriend, Ms. Briggs still reasonably feared to contact the police for any reason, out of concern that it could lead to her eviction, due to Defendants' prior enforcement of the Old Ordinance.

[10] Ms. Briggs takes great exception to Defendants' suggestion that she has withheld or misrepresented any material facts by not citing to or attaching a September 6, 2012 email between Defendants and Ms. Briggs' former landlord, informing the landlord that Ms. Briggs could stay in the property (attached as Exhibit 1A to Defendants' Response Brief).  This email is consistent with the facts alleged in the Verified First Amended Complaint and does nothing to minimize the undue chilling effect on Ms. Briggs' First Amendment rights caused by Defendants' actions, for all of the reasons discussed herein.

agreed not to inspect her rental home at that time (but only after Ms. Briggs' counsel interceded), they have not committed to refrain from doing so in the future. *Id.* ¶ 143. Despite Defendants' bald claim in their Response Brief that they are not currently enforcing the New Ordinance, Defendants have not indicated that they consider the New Ordinance to be invalid or illegal, nor have they promised not to enforce the New Ordinance against Ms. Briggs, her landlord or others in Norristown. *Id.* Indeed, Defendants' refusal to enter into a settlement agreement regarding the Old Ordinance and opposition to the Motion for Preliminary Injunction strongly suggests that Defendants do, in fact, intend to enforce the New Ordinance.

Any reasonable person in Ms. Briggs' "shoes"[11] under these circumstances would be afraid to call the police for fear of losing his or her home. *See, e.g., Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (holding that the "plaintiffs [had] alleged an actual and well-founded fear that [a] law [would] be enforced against them" and that harm could "be realized even without an actual prosecution"); *White v. Lee*, 227 F.3d 1214, 1229 (9th Cir. 2000) (holding that the plaintiff was chilled from engaging in First Amendment activities when the state actors' actions "would have chilled or silenced a person of ordinary firmness from engaging in future First Amendment activities"); *see also Pilchesky v. Miller*, Civ. Action No. 3:CV-05-2074, 2006 U.S. Dist. LEXIS 73681, at *20, 28-30 (M.D. Pa. Oct. 10, 2006) (rejecting defendants' arguments that their actions could not have objectively constituted a threat and

---

[11] Defendants conveniently ignore the "shoes" in which Ms. Briggs is standing. She is a single mother, raising a three year old child, with a Section 8 voucher, who was repeatedly threatened with eviction for calls to the police. If Ms. Briggs were ever to be evicted, she would face a significant risk of losing her voucher and being rendered homeless. Even undergoing eviction proceedings, as Ms. Briggs was forced to due to Defendants' pressure on her landlord, has negative effects on her housing opportunities as landlords often reject rental applications based on the mere existence of an eviction case against a potential tenant. *See* Rudy Kleysteuber, *Tenant Screening Thirty Years Later: A Statutory Proposal to Protect Public Records*, 116 Yale L.J. 1344, 1360 (2007). Accordingly, it is entirely reasonable that Ms. Briggs would fear calling the police, given the past actions of Defendants and the dire consequences if Defendants are free to enforce the New Ordinance against her. *See* PCADV Amicus Brief, at 6 (explaining that "Ms. Briggs made her decision to stop calling police in the same manner than any reasonable individual does," and further explaining that such a decision was reasonable because Ms. Briggs knew that an eviction from calling the police "would destroy her chances of obtaining" future housing).

holding on motion to dismiss that plaintiffs' allegations supported a finding that "Defendants impermissibly invoked the power of the state as a means of preventing the speech of Plaintiffs").

Contrary to Defendants' unsupported statement on page 6 of their Response Brief, the Old Ordinance did and the New Ordinance does, in fact, give the Chief of Police "sole discretion" to determine what constitutes disorderly behavior.  *See* Section (B)(2), Norristown Mun. Code § 245-3, Exhibit A to the Ver. First Am. Compl. (defining "disorderly behavior" as including:  "Any call to a rental dwelling unit or units to which the Norristown Police Department responds, and which, ***in the sole discretion of the Chief of Police, involves activity that can be characterized as disorderly in nature***, including, but not limited to, the following types of activity . . . ") (emphasis added); Section B(2), Ordinance No. 12-15 of 2012 (attached as Exhibit J to the Ver. First Am. Compl.) (same).  Ms. Briggs was never provided with any meaningful opportunity to challenge the Chief of Police's determinations that the incidents of domestic violence that took place at her home, for which she received a strike, constituted "disorderly behavior" under the Old Ordinance.  Indeed, at the May 23, 2012 meeting with borough officials, Ms. Briggs was effectively precluded by Defendant Bono from telling her side of the story and describing the incidents.  Ver. First Am. Compl. ¶¶ 77-80, 83.  Similarly, the New Ordinance continues to deny a tenant, like Ms. Briggs, the opportunity to contest the Chief of Police's initial determination.  The fact that a ***landlord*** may now challenge a citation issued to him or her based on a tenant's "disorderly behavior" provides no assurance to a ***tenant*** that the Chief of Police's unilateral decision to label her rental unit as disorderly will ever be reviewed by a neutral magistrate because the New Ordinance encourages a landlord to evict a tenant before a citation issues.

The supposed "exceptions" to the Old and New Ordinances did and do nothing to alleviate Ms. Briggs' reasonable fears to contact the police without risking eviction.  As discussed on page 28 of the Memorandum, it is clear from Defendants' prior enforcement of the Old Ordinance against Ms. Briggs and her landlord that the purported exceptions for calls to the police seeking "emergency assistance" under the Old Ordinance and the virtually identical New Ordinance (which contains the same provision) are devoid of any meaning.

Defendants also misread 18 Pa.C.S. § 2711(a).  That statute does not constitute a "mandatory arrest" provision that would exclude calls for police assistance for domestic violence from being deemed a "strike" under Section B(2)(e) of either the Old or New Ordinances. Section 2711(a) only provides police officers in Pennsylvania with the ***authority*** to arrest a suspect without a warrant where there is probable cause of domestic violence; it does not ***require*** that an arrest be made for domestic violence crimes.  *See, e.g., United States v. Myers*, 308 F.3d 251, 261 (3d Cir. 2002) (holding that 18 Pa.C.S. § 2711 does not provide a "substantive offense called 'domestic abuse,' 'domestic violence,' or 'domestic assault'" but "merely authorizes the police to make a warrantless arrest").

Nor does the Norristown Police Department's policy under General Order 2000-54 create a "mandatory arrest" provision for incidents of domestic violence.  General Order 2000-54 merely establishes "guidelines and procedures to be followed by police officers and other personnel involved in cases of domestic violence and violation of Protection from Abuse Orders" and instructs officers to "arrest and prosecute for criminal activity any person who commits domestic violence when probable cause exists."  *See* General Order 2000-54 (attached to Defendants' Response Brief as Exhibit D-2, at 15).  Indeed, if, contrary to fact, either of these provisions (individually or taken together) actually excluded victims of domestic violence in

Norristown, such as Ms. Briggs, from application of the Old or New Ordinances when the police are called to protect them from being battered in their homes, Defendants could not have assigned strikes against Ms. Briggs under the Old Ordinance for calls to the police regarding incidents of domestic violence.

Remarkably, Defendants argue on page 14 of their Response Brief that Ms. Briggs' pursuit of this litigation somehow shows that her First Amendment right to petition has not been chilled.  Quite to the contrary, Ms. Briggs filed this action and the Motion for Preliminary Injunction precisely because her First Amendment right to seek police assistance and to report incidents of domestic violence or other criminal activity has been and continues to be infringed by Defendants.  In filing this action, Ms. Briggs is exercising her constitutional right of access to the courts, which is a distinct right protected by the First Amendment's right to petition clause.  *See, e.g., Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494, 2498 (2011) (noting that the right of access to courts is only one aspect of the First Amendment right to petition, explaining that "the right to petition is not limited to petitions lodged under formal procedures," and holding that even a "questionnaire [might] be viewed as a petition for redress of grievances"); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("Certainly the right to petition extends to all departments of the Government.  The right of access to the courts is indeed but one aspect of the right of petition.").

Defendants' reliance on *Robinson v. Vaughn*, Civ. Action No. 92-7048, 1993 U.S. Dist. LEXIS 15566, at *15, 1993 WL 451495 (E.D. Pa. 1993) (holding that *pro se* prisoner civil rights plaintiff did not allege facts sufficient to claim that "his right of access to the courts ha[d] been abridged"), is thus misplaced, because Ms. Briggs is not asserting any infringement of her First Amendment right of access to the courts.  The mere fact that Defendants have not infringed

Ms. Briggs' right of access to the Courts has no bearing on her claims that their actions have caused an undue chilling effect on her right to petition in a different way, by seeking police assistance and by reporting criminal activity.  Indeed, if such a right to petition claim could be defeated simply by pointing out that it had been filed in court, then no plaintiff could possibly seek to prosecute a right to petition claim.  Such an illogical result cannot stand.

### 3. The Old and New Ordinances Cannot Withstand Strict Scrutiny.

As discussed on pages 24 through 29 of the Memorandum, strict scrutiny applies to Ms. Briggs' First Amendment claims, and neither of the Ordinances can withstand such judicial scrutiny.  *See, e.g., Am. Civil Liberties Union v. N.J. Election Law Enforcement Comm'n*, 509 F. Supp. 1123, 1128-29 (D.N.J. 1981) (providing that laws that infringe on the right to petition "must be based on a compelling governmental interest" and take the "least restrictive means to further such an interest").

Defendants' reliance on *Project Vote v. Kelly*, 805 F. Supp. 2d 152, 174 (W.D. Pa. 2011) (holding that because the reviewed statute did not "impose a 'severe' burden on . . . election-related activities . . . a 'less exacting' standard of review" was appropriate) (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)), is misplaced.  The court's ruling in *Project Vote*, upholding a section of the election code that restricted payments to individuals for collecting voter-registration applications under certain circumstances, has no bearing on the Court's analysis here relating to the infringement of Ms. Briggs' First Amendment right to petition by seeking the assistance of law enforcement.  Ms. Briggs does not contend that the Old Ordinance caused, or that the New Ordinance causes, any impairment of her right to vote or to engage in other election-related activities, which is a distinct right protected by the First Amendment that is necessarily subjected to different analysis.

As discussed in the Memorandum, Defendants' purported interests behind the Ordinances – "decreas[ing] the burden and expense on the Norristown Police in having to respond to incidents of domestic violence or other disorderly behavior" and protecting "the health, safety and welfare of all neighbors who live in proximity to a disorderly house" (Defendants' Response Brief, at 3-4) – are neither compelling, nor even served by the Ordinances.  Notably, the Ordinances directly contradict the Norristown Police Department's own stated interests, expressed in the "Purposes and Goals" of General Order 2000-54 (attached as Exhibit 2 to Defendants' Response Brief, at 1-2); Defendants' Response Brief, at 4 ("The stated goal of [General Order 2000-54] is to reduce the incidents and severity of domestic violence and to ensure that law enforcement services are available to victims in such cases.").  Specifically, the Ordinances denied and continue to deny law enforcement services and police resources to victims of domestic violence, silenced and continue to silence such victims from reporting acts of violence against them, and thus, perversely, have increased the incidence and severity of domestic violence in Norristown.[12]

Defendants' assertions of a "rational relationship" between the Ordinances and the purported interests served fall well below the standard required under strict scrutiny.  As discussed in the Memorandum, the supposed interests underlying the Ordinances are insufficient to justify infringing the First Amendment rights of Ms. Briggs and other tenants in Norristown.  Nor are the Ordinances narrowly tailored to avoid infringing their First Amendment rights.  As discussed above, the supposed "exceptions" to the application of the Ordinances were and are devoid of meaning, and did and do nothing to protect Ms. Briggs and other tenants (or their

---

[12] It also appears that Defendants' actions in enforcing the Old Ordinance against Ms. Briggs violated General Order 2000-54 by disregarding the obvious signs of domestic violence being perpetrated against her when the police responded to calls to her home between April and June 2012.

landlords) when they exercise their First Amendment right to petition by calling the police to report incidents of domestic violence.

Defendants' reliance on *Bloomsburg Landlords Ass'n, Inc. v. Town of Bloomsburg,* 912 F. Supp. 790 (M.D. Pa. 1995), and *Berwick Area Landlord Ass'n v. Borough Berwick*, 48 A.3d 524 (Pa. Cmwlth. Ct. 2012), is similarly misplaced for two reasons.  First, neither of the ordinances in *Bloomsburg* and *Berwick* implicated the fundamental First Amendment right to petition, nor, for that reason, were they subjected to strict scrutiny review. *See Bloomsburg Landlords Ass'n, Inc.*, 912 F. Supp. at 800 ("None of the restrictions imposed infringes on protected First Amendment rights; hence nothing triggers a heightened level of civil scrutiny."); *Berwick Area Landlord Ass'n*, 48 A.3d at 527 (evaluating only Pennsylvania constitutional and statutory law claims).[13]

Second, the courts' reviews of the Bloomsburg and Berwick Ordinances were limited to facial challenges of those ordinances and did not involve factual, "as applied" challenges.  *See Bloomsburg Landlords Ass'n, Inc.*, 912 F. Supp. at 802 (facial challenge of ordinance as "overly broad"); *Berwick Area Landlord Ass'n*, 48 A.3d at 533 ("Appellants challenge to the Ordinance is facial. . . . The record does not contain evidence of . . . the imposition of any specific penalties by the Borough.").  Here, there is ample factual support that Defendants' actions in doggedly enforcing the Old Ordinance against Ms. Briggs and her landlord and enacting the virtually identical New Ordinance have already caused and continue to cause an undue chilling effect on Ms. Briggs' First Amendment right to petition.

---

[13] *See also Berwick Area Landlord Ass'n v. Borough of Berwick*, Civ. Action No. 4:07-CV-316, 2007 U.S. Dist. LEXIS 51207, at *11, *11 n.1 (M.D. Pa. July 16, 2007) (holding, in a prior case discussing the same ordinances, that neither the Berwick ordinance nor the "virtually identical" Bloomsburg ordinance were "civil statutes that . . . affect First Amendment rights" and, thus, were allowed "greater tolerance") (internal citation omitted).

4.     **Ms. Briggs Has Standing to Bring Her First Amendment
Claims and this Case Is Ripe for Judicial Review.**

Defendants' argument that Ms. Briggs lacks standing because she has not suffered

a cognizable "injury in fact" does not have any basis in law or fact.  Indeed, because First

Amendment rights are at stake, Ms. Briggs not only has standing on her own behalf, but if she

wanted to pursue the claim on behalf of other tenants in Norristown, the broadened concepts of

standing in First Amendment cases would permit her to do so.  *See, e.g., Am. Booksellers Ass'n*,

484 U.S. at 392-93 (holding that "in the First Amendment context, litigants are permitted to

challenge a statute . . . because . . . the statute's very existence may cause [them or] others not

before the court to refrain from constitutionally protected speech or expression.") (internal

quotation marks omitted).  Moreover, as discussed above, Ms. Briggs clearly suffered and

continues to suffer a current, concrete injury to her First Amendment right to petition.  *See, e.g.,*

*id.* (finding "injury in fact" requirement met where "the law is aimed directly at plaintiffs, who

. . . [would] have to take significant and costly compliance measures or risk criminal

prosecution") (internal citations omitted); *Neiderhiser v. Berwick*, 840 F.2d 234, 216-17 (3d Cir.

1988) (holding defendant municipality's threatened enforcement of ordinance sufficient to

establish standing).[14]

Defendants' argument that this dispute is not ripe for judicial determination is

equally untenable.  The parties' legal interests are clearly adverse and, as discussed above,

---

[14] Remarkably, Defendants assert on page 11 of their Response Brief that Ms. Briggs lacks standing because her harm was caused by her former boyfriend's physical abuse, not by any actions by Defendants in penalizing Ms. Briggs for calling the police in the effort to avoid being the victim of such "disorderly behavior." Defendants' transparent attempt to pass off blame to Ms. Briggs' former boyfriend for the injuries to her First Amendment rights is as telling as it is ridiculous.  Defendants' argument belies their unsupported claim that they have no intention of enforcing the New Ordinance and demonstrates that they would, in fact, enforce the New Ordinance against Ms. Briggs and her landlord if the police were called to her residence to protect her from further domestic violence – in which case, they can excuse their actions and blame any resulting infringement of her First Amendment rights on her abuser.

Defendants' course of conduct – in vigorously enforcing the Old Ordinance against Ms. Briggs, feigned repeal of the Old Ordinance and prompt enactment of the New Ordinance, refusal to enter into a settlement agreement regarding the Old Ordinance, attempted "random inspection" of her rental home, and failure to commit not to enforce the New Ordinance against Ms. Briggs, her landlord or others in Norristown – have all contributed to cause a current, real and palpable chilling effect on Ms. Briggs' First Amendment right to petition.  Contrary to Defendants' unsupported claims in their Response Brief that they will not enforce the New Ordinance against Ms. Briggs and that they are not currently enforcing the New Ordinance, Defendants have at no time communicated that they consider the New Ordinance to be invalid or illegal; nor have they promised not to apply the New Ordinance against Ms. Briggs, her landlord or others in Norristown.  *See* Ver. First Am. Compl. ¶ 148.  Indeed, any such claims are belied by Defendants' opposition to the Motion for Preliminary Injunction.

Ms. Briggs need not wait until Defendants make further attempts to force her landlord to evict her for this case to be ripe for judicial determination.  *See, e.g., Presbytery of the Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1470 n.13 (3d Cir. 1994) (holding that a plaintiff does not need to suffer legal penalty before a controversy is ripe for adjudication; threat of penalty is sufficient:  "Current First Amendment jurisprudence does not require a Thoreau or a Gandhi who is willing to go to jail for his beliefs but permits the more cautious Emersons among us to assert our fears of interference with our this [sic] country's fundamental rights in the civilized atmosphere of a court before subjecting ourselves to the risk of arrest and jail."); *Neiderhiser*, 840 F.2d at 217 (holding that a "ripe controversy exists" when  an "ordinance is still on the books and capable of utilization" and explaining that "just because it has not yet been formally utilized by [the defendant] does not preclude its future use"); *see also*

*Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (holding that a case was ripe for adjudication when plaintiff was threatened that if he "disobey[ed] a warning to stop" engaging in First Amendment activity, he would "likely be prosecuted").  Accordingly, Ms. Briggs has standing to assert her First Amendment claims and this case is ripe for adjudication.

> **C.    The Old Ordinance Violated and the New Ordinance Continues to Violate Ms. Briggs' Right to Be Free from Unreasonable Interference with Her Property Interest as Protected by the Fourth Amendment to the United States Constitution.**

Defendants' vigorous enforcement of the Old Ordinance meaningfully interfered with Ms. Briggs' use and enjoyment of her rental home, in violation of the Fourth Amendment. *See, e.g., Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (holding that a seizure occurs when "there is some meaningful interference with an individual's possessory interests in that property"); *Berrios v. Lancaster*, 798 F. Supp. 1153, 1157 (E.D. Pa. 1992) (holding that a leasehold is a property interest under Pennsylvania law).

Although Ms. Briggs was not ultimately evicted under the Old Ordinance (only because the District Justice hearing the eviction proceedings ruled in favor of Ms. Briggs despite Defendants' demands that her landlord evict her), Defendants' enforcement of the Old Ordinance deprived her of the ability to retreat into, and to find safety and security in her own home.  *See, e.g., Soldal*, 506 U.S. at 61 (explaining that a seizure interferes with the right "at the very core" of the Fourth Amendment—the "right . . . to retreat into [one's] home") (internal quotations omitted).  Defendants' dogged enforcement of the Old Ordinance against her and her landlord effectively denied Ms. Briggs the ability to contact the police to report the incidents of domestic violence being perpetrated against her and forced her to endure further abuse at the hands of her former boyfriend, which was disruptive, stressful, invasive, painful and ultimately, life-threatening.  *See, e.g., Presley v. City of Charlottesville*, 464 F.3d 480, 487-88 (4th Cir. 2006)

(reversing dismissal of Fourth Amendment claim where plaintiff alleged that defendant state actors had a policy that encouraged private individuals to trespass on her property, which was "disruptive, stressful, and invasive").

Defendants' feigned repeal of the Old Ordinance and prompt enactment of the New Ordinance, refusal to enter into a settlement agreement regarding the Old Ordinance, attempted "random inspection" of her rental home, and now threatened enforcement of the New Ordinance have further impeded Ms. Briggs ability to seek the assistance of law enforcement and, thus, continue to interfere with her property interest in her leasehold for the same reasons. Indeed, Ms. Briggs did not feel sufficiently safe or secure in her own home to report the trespass of an armed gunman who ran through her backyard in April of this year.  Ver. First Am. Compl. ¶ 147.  Although Defendants ultimately refrained from conducting their "random inspection" of Ms. Briggs' home in December 2012 (only after Plaintiff's counsel intervened), this attempted illegal inspection contributed to Defendants' pervasive interference with Ms. Briggs' ability to enjoy the safety and security of her home, in violation of the Fourth Amendment.  *See, e.g., Doe v. LaDue*, 514 F. Supp. 2d 1131, 1135-36 (D. Minn. 2007) (holding that plaintiffs had properly alleged a Fourth Amendment seizure claim when state actors could show no cause for "random" inspection of plaintiffs' house, which interrupted "the quiet enjoyment of [plaintiffs'] home").

Defendants' reliance on *Marcavage v. Borough of Lansdowne*, 493 Fed. Appx. 301, 307-08 (3d Cir. 2012) (dismissing plaintiff landlord's Fourth Amendment claim when he refused to submit to a city's inspection for the privilege of obtaining a rental license) is misplaced.  Neither Ms. Briggs's landlord nor she is claiming that Defendant's attempted illegal inspection of her home by itself constituted a deprivation of any property interest.

-34-

Defendants' reliance on *Watson v. Phila. Hous. Auth.*, 629 F. Supp. 2d 481, 485 (E.D. Pa. 2009) is equally misguided.  In *Watson*, the court rejected a *pro se* plaintiff's claim that the Philadelphia Housing Authority violated her Fourth Amendment rights when her personal property was confiscated during the eviction process because the plaintiff failed to show that the deprivation was caused by an official policy or custom of the housing authority as opposed to those who moved her belongings.  *Id.* at 487.  In this case, however, the Old Ordinance caused the interference in Ms. Briggs' property interests, including her landlord's initiation of eviction proceedings against her.  Ver. First Am. Compl. ¶¶ 106, 108.  Unlike the plaintiff in *Watson*, Ms. Briggs was deprived of a property interest in the safety and security of her own home and this deprivation was caused by Defendants' enforcement of an admittedly official policy of Norristown.  *See* Defs' Mot. to Dismiss Brief, at 41 ("Here, there is no question that the municipality of Norristown adopted an ordinance that would constitute a policy under *Monell*.").

Any future eviction resulting from Defendants' threatened enforcement of the New Ordinance would certainly constitute a meaningful interference with Ms. Briggs' property interests and, thus, supports Ms. Briggs' request for declaratory and injunctive relief.  *See, e.g., Gale v. Storti*, 608 F. Supp. 2d 629, 633 (E.D. Pa. 2008) (holding that eviction constitutes meaningful interference in violation of the Fourth Amendment).  Although the New Ordinance does not give Norristown officials the power to evict tenants directly, in situations where the landlord would not evict a tenant but for the prospect of being subject to criminal fines under the ordinance, the New Ordinance is the proximate cause of the eviction.  *See, e.g., Malley v. Briggs*, 475 U.S. 335, 345 (1986) ("§ 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'") (internal citation and quotation mark omitted); *Paige v. Coyner*, 614 F.3d 273, 281 (6th Cir. 2010) (holding that

government official could be liable for plaintiff's termination where official's call to plaintiff's employer was cause in fact and proximate cause of plaintiff's termination); *Kerman v. City of New York*, 374 F.3d 93, 126-28 (2d Cir. 2004) (holding that hospital's decision to admit plaintiff for psychiatric observation did not break chain of causation in Section 1983 suit against police officer who took him there).

Defendants' threatened enforcement of the New Ordinance traps Ms. Briggs in one of two scenarios.  Ms. Briggs may call the police and be deprived of her home, or she may refrain from calling the police and be deprived of any safety in her home.  Either way, Ms. Briggs suffers meaningful interference with her property interests, in violation of the Fourth Amendment.

### D.   The Old Ordinance Violated and the New Ordinance Continues to Violate Ms. Briggs' Right to Procedural Due Process as Protected by the Fourteenth Amendment to the United States Constitution.

The Old Ordinance did not and the New Ordinance does not provide tenants in Norristown with any meaningful opportunity to challenge the Chief of Police's unilateral determination that incidents to which the police respond at their rental properties constitute "disorderly behavior" before being subject to eviction.  They thus violate the Fourteenth Amendment.  *See, e.g., Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976) (holding that at a minimum, notice and a hearing is required before a state actor deprives a person of a property interest).[15]

---

[15] *See also Mathews*, 424 U.S. at 335 (holding that a court considering whether a state actor took adequate procedural measures before depriving a person of a property interest must consider:  "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.").

As discussed above, Ms. Briggs clearly has a property interest in her leasehold. Indeed, as a Section 8 tenant, Ms. Briggs holds an exceptional property interest in her rental property, and thus must be afforded additional procedural safeguards before she can be deprived of housing.  *See, e.g., McMichael v. Chester Housing Authority*, 325 F. Supp. 147, 148-49 (E.D. Pa. 1971) (holding that public housing tenants must receive additional procedural safeguards before being deprived of housing, as required by *Goldberg v. Kelly*, 397 U.S. 254 (1970)); *Pratt v. Camden Hous. Auth.*, Civ. Action No. 05-0544 (NLH), 2006 U.S. Dist. LEXIS 70575 (D.N.J. Sept. 27, 2006) (extending *Goldberg* to Section 8 tenants and granting summary judgment in favor of plaintiff Section 8 tenant); *Jeffries v. Ga. Residential Fin. Auth.*, 503 F. Supp. 610, 618 (N.D. Ga. 1980) (granting summary judgment in favor of Section 8 tenants and holding that under *Goldberg*:  "Section 8 existing housing tenants . . . have a property interest of which state government cannot deprive them without affording the tenants due process of law.").[16]  The procedures provided by the Old and New Ordinances fall well-short of that which is required to prevent the erroneous deprivation of Ms. Briggs' property interests.

The notice and hearing procedures prescribed by the Old Ordinance were grossly inadequate to provide Ms. Briggs (or other tenants in Norristown) with the necessary procedural due process protections required by the Fourteenth Amendment, because they did not provide any opportunity to challenge the Chief of Police's unilateral determinations that the incidents at her rental property constituted "disorderly behavior" before her landlord's rental license was revoked or suspended.  The language of the Old Ordinance only provided her landlord and

---

[16] *See also Caulder v. Durham Housing Authority*, 433 F.2d 998, 1004 (4th Cir. 1970) ("Succinctly stated, *Goldberg* requires (1) timely and adequate notice detailing the reasons for a proposed termination, (2) an opportunity on the part of the tenant to confront and cross-examine adverse witnesses, (3) the right of a tenant to be represented by counsel, provided by him to delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination and generally to safeguard his interests, (4) a decision, based on evidence adduced at the hearing, in which the reasons for decision and the evidence relied on are set forth, and (5) an impartial decision maker.")

borough officials with the "opportunity to be heard."  *See* Norristown Mun. Code § 245-3(I) ("The licensee and the Building Official shall be given an opportunity to be heard.") (Exhibit A to the Ver. First Am. Compl.).  Indeed, at the May 23, 2012 meeting, which Ms. Briggs attended with her landlord and borough officials regarding the revocation of the rental license for her home, Ms. Briggs was effectively prevented from telling her side of the story or describing the incidents that were deemed to constitute "disorderly behavior," and her friend was denied the right to speak at all.  Ver. First Am. Compl. ¶¶ 80, 83.

Although the Old Ordinance stated that the Municipal Administrator "shall hear all relevant evidence and arguments and shall review all testimony, documents, and other evidence," Norristown Mun. Code § 245-3(I), Exhibit A to the Ver. First Am. Compl., only Ms. Briggs' landlord, the Chief of Police and other borough officials were permitted to speak at the meeting and provide the "evidence" that informed the Municipal Administrator's decision to place her property on a 30 day probationary period.  *Id.* ¶¶ 76-83.   There was no hearing whatsoever when the rental license for her property was ultimately revoked due to the incident in which Ms. Briggs had been brutally attacked and almost killed by her former boyfriend at the rental home.  *See, e.g., McMichael*, 325 F. Supp. at 150 (holding that a public housing tenant must have the ability to respond to and provide explanation for the complaints against her "before an effective notice of termination may be rendered").  To the extent the Old Ordinance provided any procedural safeguards, they were afforded only to landlords, not their tenants.

Moreover, the May 23, 2012 meeting did not provide any of the typical elements required to satisfy procedural due process under the Fourteenth Amendment.  The meeting only lasted 30 minutes, no official record, transcript or minutes were kept, Ms. Briggs was not provided an opportunity to present witnesses or confront opposing witnesses (indeed, her friend

was barred from speaking at all), and no one appeared to be designated as an impartial finder of fact.  *See* Ver. First Am. Compl ¶¶ 78, 80; *see, e.g., McMichael*, 325 F. Supp. at 148 (holding that when a public housing tenant "is threatened with being deprived of her rights without due process of law," a court has jurisdiction "to assess the constitutional adequacy of the procedures involved" because "the housing of a person who is not in a position to obtain alternate living quarters is threatened"); *see also DePiero v. City of Macedonia*, 180 F.3d 770, 777, 781 (6th Cir. 1999) (holding that plaintiff had properly stated a procedural due process claim when he alleged that defendant mayor was not a "neural arbiter" because defendant's "executive responsibilities" might present a "possible temptation to be partial to the word of [the police officer under defendant's executive branch supervision] over plaintiff").[17]  Indeed, Defendants have already conceded that the procedures provided under the Old Ordinance were inadequate and were likely to "result in the deprivation of property rights for tenants without due process in violation of the 5th and 14th Amendments to the U.S. Constitution and other federal and state statutes."  *See* Ordinance No. 12-11, attached as Exhibit H to the Ver. First Am. Compl.

The subsequent eviction proceeding before District Justice Hunsicker, which Ms. Briggs' landlord was compelled to file against her pursuant to Defendants' demands under the Old Ordinance, similarly did not afford any opportunity for Ms. Briggs to challenge the Chief of Police's unilateral determination that the incidents at her rental home constituted "disorderly behavior" for two reasons.  First, that supposed "finding" was pre-determined in a different "venue," which triggered the eviction proceeding, and was not subject to review by the District Justice.  Second, none of Defendants (including the Chief of Police) were parties to – or even

---

[17] *See also Grayden v. Rhodes*, 345 F.3d 1225, 1235 (11th Cir. 2003) (holding that even when a municipal law affords some procedural safeguards, a court should  be concerned with "whether additional or different procedures would afford marginally better protection against the possibility of an erroneous deprivation").

present at – the eviction proceedings to answer such a challenge.  Of course, Ms. Briggs'

landlord, who was bringing the eviction action, was not a proper party against whom to contest

the Chief of Police's determination that incidents of "disorderly behavior" had taken place at her

rental home, because her landlord did not make any such determination and, in fact, agreed with

Ms. Briggs that she should not be evicted for such alleged "disorderly behavior."  Although Ms.

Briggs was not ultimately evicted under the Old Ordinance (only because the District Justice

hearing the eviction proceedings ruled in favor of Ms. Briggs, despite Defendants' demands that

her landlord evict her), the procedures under the Old Ordinance were grossly inadequate to guard

against the high risk of erroneous deprivation of Ms. Briggs' interest in her leasehold.  *See, e.g.,*

*Jeffries*, 503 F. Supp. at 619  ("Moreover, the fact that the housing involved in this case is

provided by the government for those living at subsistence levels implicates special concerns. . . .

Therefore, the court must consider not only the weight of the deprivation but the risk that the

deprivation may be made erroneously.").

Defendants' reliance on *Watson v. Phila. Hous. Auth.*, 629 F. Supp. 2d 481, 486

(E.D. Pa. 2009) (holding that "state laws and federal regulations . . . set forth procedures that a

housing authority must follow when evicting a tenant") is misplaced.  Ms. Briggs is not

contesting the procedures by which her landlord sought her eviction, in obedience to Defendants'

demands under the Old Ordinance.  Unlike the plaintiff in *Watson*, who received multiple

hearings to contest the allegations supporting her eviction, Ms. Briggs was not afforded any

meaningful opportunity to challenge the Chief of Police's unilateral decision that incidents to

which the police responded constituted "disorderly behavior" before the borough revoked her

landlord's rental license and drove him to seek her eviction.

Contrary to Defendants' unsupported claim on page 16 of their Motion to Dismiss Brief – that Ms. Briggs is not entitled to procedural due process because "the ramifications of the Ordinance are directed to the landlord" – the adverse consequences of Defendants' threatened enforcement of the New Ordinance against her landlord are inevitably felt by Ms. Briggs and other tenants in Norristown.  Indeed, the New Ordinance threatens to deprive Ms. Briggs of her property interest in her leasehold by subjecting her landlord to potential criminal fines for any alleged "disorderly behavior" at her home and by directing and incentivizing her landlord to initiate eviction proceedings against her.  The New Ordinance does not provide any mechanism whatsoever for a tenant to challenge the Chief of Police's unilateral determination that incidents of "disorderly behavior" occurred at a rental property.  Although the New Ordinance appears to provide a *landlord* with the right to challenge a citation issued to him or her based on a tenant's "disorderly behavior" in a "court of competent jurisdiction," it provides no opportunity in any forum for a *tenant*, like Ms. Briggs, to contest the Chief of Police's unilateral decision to label her rental unit as "disorderly."  And, as discussed above, any subsequent eviction proceeding would not provide any opportunity for a tenant, like Ms. Briggs, to challenge the Chief of Police's unilateral determination of "disorderly behavior."  Even if an eviction proceeding were an adequate forum for reviewing the Chief of Police's unilateral decision to label her rental unit as "disorderly," there is no guarantee that such determination would ever be reviewed by any neutral magistrate because the New Ordinance actually encourages a landlord to evict a tenant as a condition for preventing the issuance of a "disorderly" label to the rental unit.  Thus, while the penalty of eviction is passed onto the tenant, the New Ordinance shields the landlord from penalty if the landlord carries out Norristown's desire to evict a tenant.

Accordingly, Defendants' enforcement of the Old Ordinance violated, and any attempt to enforce the New Ordinance against Ms. Briggs or any other tenant in Norristown for alleged "disorderly behavior" at their rental properties would violate, the Fourteenth Amendment's Due Process Clause.

E.     **The Old Ordinance Violated and the New Ordinance Continues to Violate Ms. Briggs' Right to Be Safe from State-Created Danger under the Fourteenth Amendment to the United States Constitution.**

By enforcing the Old Ordinance against Ms. Briggs, Defendants knowingly subjected her to a significant risk of increased incidence and severity of violence at the hands of her former boyfriend, a classic example of "state-created danger," in violation of the Substantive Due Process Clause of the Fourteenth Amendment. *See, e.g., Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 432 (2d Cir. 2009) (holding that a plaintiff properly pleaded state-created danger claim when jury could conclude that the defendant state actors "demonstrate[d] a willful disregard of the obvious risks of a domestic violence situation . . . and the likelihood that their misconduct would enhance the danger" to a domestic violence victim).

Although a municipality generally may not be held liable for harm perpetrated by one individual against another, *see DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) (holding that "the Due Process Clauses generally confer no affirmative right to governmental aid"); *White v. City of Philadelphia*, 118 F. Supp. 2d at 568 ("State actors do not have an affirmative obligation to protect individual citizens from private violence."), a municipality and its agents may be held liable for failure to protect a victim from harm that they either increased or played a part in creating where:

> (1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed.

*Phillips v. County of Allegheny*, 515 F.3d at 235 (reversing dismissal of state-created danger theory claim); *see also Zenquis v. City of Philadelphia*, 861 F. Supp. 2d 522, 532 (E.D. Pa. 2012) (holding a state-created danger claim properly alleged where the facts suggested that defendant city implicitly encouraged private individuals to physically assault plaintiff).

### 1. Defendants knew that their enforcement of the Old Ordinance increased the risk of domestic violence to Ms. Briggs.

Defendants knew or should have foreseen that their actions in enforcing the Old Ordinance against Ms. Briggs and her landlord would put her in serious danger of continued domestic abuse and would cause her to suffer severe bodily injury at the hands of her former boyfriend. *See, e.g., Phillips v. County of Allegheny*, 515 F.3d at 237-39 (holding that plaintiff need only show that the state actors had "an awareness of risk that is sufficiently concrete to put the actors on notice of the harm" that would occur to the plaintiff as a "fairly direct result" of the state actors' actions).

Defendants' assertions on page 19 of their Motion to Dismiss Brief to the effect that Defendants did not know that Ms. Briggs was a domestic violence victim is contrary to the facts pleaded in the Verified First Amended Complaint. The Defendants knew that her former boyfriend was violent, had a criminal record, and had a history of physically abusing Ms. Briggs. Indeed, the Norristown police had arrested him on at least two occasions for violent assaults on Ms. Briggs before he brutally attacked and almost killer her in June 2012. Ver. First Am. Compl. ¶¶ 62, 74; *see, e.g., Estate of Arrington v. Michael*, Civ. Action No. 11-cv-4534, 2012 U.S. Dist. LEXIS 179222, at *19 (E.D. Pa. Dec. 18, 2012) (Joyner, J.) (holding that harm was foreseeable and fairly direct when defendant state actor knew of the perpetrator's criminal history and threats of physical violence against the victim).

Defendants knew that domestic violence was a significant concern in Norristown. They even had an established Police Department policy, which was designed to reduce the incidence and severity of domestic violence in the borough.  *See* General Order 2000-54, attached as Exhibit 2 to Defendants' Response Brief, at 1.  According to this policy, Defendants knew that it was critical to "insure that law enforcement services are as available in domestic violence cases as they are in other criminal cases."  *See id.*  Defendants knew that they needed "to make more effective use of police resources to break the cycle of violence." *See id.*  They knew that it was imperative to "afford maximum protection, safety and support to victims of domestic violence" in order to reduce "the number of interventions required in a specific household."  *See id.*  They also knew that domestic violence could result in "serious assaults and killings" particularly when "a victim is separating from the assailant."  *See id.* at 4.

Defendants knew that assigning "strikes" to Ms. Briggs for calling the police to respond to incidents of domestic violence at her rental home would cause her to refrain from calling the police for fear of triggering her eviction.  Indeed, it was their objective to silence her from making future calls to the police.  The police officer who first told her about the Old Ordinance specifically threatened her that future calls to the police would lead to her eviction, telling her:  "You are on three strikes.  We're gonna have your landlord evict you."  Ver. First Am. Compl. ¶ 56.  This message was reinforced with each subsequent strike and ultimately driven home by Defendant Forrest's May 23, 2012 letter decision, declaring that any further "disorderly behavior" at Ms. Briggs' rental home during the 30-day probationary period would result in the suspension or revocation of her landlord's rental license and thus lead to her eviction.  *Id.* ¶¶ 84-86.

Defendants knew or should have known that enforcing the Old Ordinance against a domestic violence victim, like Ms. Briggs, would effectively prevent her from contacting the police to report incidents of domestic violence and thus increase the risk of future harm to her from a known abuser. *See, e.g., Okin*, 577 F.3d at 432-32, 440 (holding that defendant municipality and its officers were aware of the plights of domestic violence victims and should have foreseen how the municipality's policy "potentially enhanc[ed] the risk of [domestic] violence"). Accordingly, the harm to Ms. Briggs was foreseeable and direct.

> **2.    Defendants acted with deliberate indifference to the harm the Ordinances would cause Ms. Briggs.**

Notwithstanding their knowledge, Defendants doggedly pursued enforcement of the Old Ordinance against her with deliberate disregard for the known threats to her personal safety. *See, e.g., Okin*, 577 F.3d at 431-432 (holding that the facts alleged supported the conclusion that the defendant state actors acted with deliberate indifference that shocked the conscience when they knew the risks that domestic violence victims faced yet disregarded such risks). Contrary to Defendants' unsupported statements on Page 19 of their Motion to Dismiss Brief, Defendant Bono, as Chief of Police, knew or should have known that Ms. Briggs was the victim of repeated domestic violence from his review of the police reports recording the incidents for which Ms. Briggs was assigned strikes for alleged "disorderly behavior" at her rental home. Defendants Forrest, Bono, and Januzelli must have been aware of Ms. Briggs' status as a domestic violence victim by the time of the May 23, 2012 meeting, at the very latest, in which they deliberated whether Ms. Briggs' landlord's rental license should be revoked and whether she should be evicted for such "disorderly behavior." Ver. First Am. Compl. ¶¶ 77-79. Thus, Defendants were well-aware of the risks that Ms. Briggs faced at the hands of her abuser, and yet enforced an Ordinance against her and her landlord that intentionally stripped her of the

ability to contact the police to report the domestic violence being perpetrated against her, unless she wanted to lose her home. *See, e.g., Okin*, 577 F.3d at 432 (holding that "[i]t requires no inferential leap, in light of what the officers must have known, for a reasonable factfinder to conclude that the officers' actions demonstrate a willful disregard of the obvious risks of a domestic violence situation"). Defendants' actions and deliberate disregard for her safety certainly "shock the conscience."

> 3. **It was reasonably foreseeable that Defendants' enforcement of the Old Ordinance would subject Ms. Briggs to increased risk of harm.**

Defendants had more than sufficient contact with Ms. Briggs to reasonably foresee that their rabid enforcement of the Old Ordinance against her would place Ms. Briggs at an increased risk of violence from her known abuser. *See, e.g., Phillips v. County of Allegheny*, 515 F.3d at 242 (holding that state-created danger does not require a plaintiff to "plead facts that show the same 'special relationship' basis for constitutional liability. . . . Instead, the relationship requirement of the third element 'contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense.'") (internal citation omitted); *Estate of Arrington*, 2012 U.S. Dist. LEXIS 179222, at *20-22 (holding that plaintiff's decedent was a foreseeable victim when the defendant knew the perpetrator "posed a grave risk to [the victim's] safety").

Contrary to Defendants' unsupported assertion on page 19 of their Motion to Dismiss Brief, Ms. Briggs was not just "a member of the public in general." Given Defendants' regular interactions with Ms. Briggs regarding the repeated domestic violence being perpetrated against her by her known abuser, it was readily foreseeable to Defendants that she would be the victim of further domestic violence. Defendants interacted with Ms. Briggs on least four occasions, before the most severe attack, during which they learned of the clear domestic

violence that was being perpetrated against her by her former boyfriend, including the three

incidents of domestic violence for which they assigned Ms. Briggs strikes, as well as the May 23,

2012 meeting among Ms. Briggs, her landlord and borough officials regarding whether to revoke

her landlord's rental license and whether to evict her for being the victim of such "disorderly

behavior."  Ver. First Am. Complaint ¶¶ 49-86; *see, e.g., Rivas v. City of Passaic*, 365 F.3d 181,

197 (3d Cir. 2004) (holding that the plaintiff's decedent was a foreseeable victim and not a part

of the general public when the very purpose of defendants' contact with the victim was in

response to an incident at the victim's home).  In each encounter with Ms. Briggs, Defendants

hammered home their clear message:  if you call the police to report domestic violence, you will

be evicted.  Accordingly, it should have come as no surprise to Defendants that Ms. Briggs

refrained from calling the police when she was being battered in her home and ultimately was

brutally attacked and almost killed due to their enforcement and threats of eviction under the Old

Ordinance.

> **4.   Defendants' affirmative actions in enforcing the Old
> Ordinance against Ms. Briggs and instructing her that any
> calls to the Norristown police could result in her eviction
> placed her at an increased risk of severe bodily injury.**

In enforcing the Old Ordinance against her, Defendants engaged in several

affirmative acts that explicitly discouraged Ms. Briggs from contacting the police to report

domestic violence and emboldened her abuser to continue battering her with impunity.

Defendants' official actions under the Old Ordinance directly increased Ms. Briggs'

vulnerability to domestic violence and placed her in a zone of danger that would not have existed

otherwise. *See, e.g., Phillips v. County of Allegheny*, 515 F.3d at 235-37 (reversing grant of motion to

dismiss and holding that plaintiff had sufficiently alleged state actors "use[d] their authority to

create an opportunity that otherwise would not have existed for the third-party's crime to occur"

when plaintiff pled "a direct causal relationship between [defendants'] affirmative act and plaintiff's harm" (citing *Kneipp by Cusack v. Tedder*, 95 F.3d 1199, 1208 (3d Cir.1996))); *Rivas*, 365 F.3d at 197 (holding that a "reasonable factfinder could conclude" all of defendants' efforts "when taken together, created an opportunity for harm that would not have otherwise existed"); *Okin*, 577 F.3d at 429-30 (holding that even without "explicit approval or encouragement" of domestic violence, "affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence"); *Pearce v. Labella*, 473 Fed. Appx. 16, 18-19 (2d Cir. 2012) (unpublished) (holding that "at the pleading stage," plaintiff had stated a claim of state-created danger because the facts, if true, could show that state actors had implicitly communicated to a domestic violence abuser "that he or she will not be arrested, punished or otherwise interfered with while engaging in conduct that is likely to endanger the life, liberty or property of others").

Defendants affirmatively enacted and enforced the Old Ordinance against Ms. Briggs, issued strikes against her for seeking assistance from the Norristown police, attempted to remove her from her rental property, and terrified her into believing that she would be evicted if she continued to seek emergency assistance from the police. Prior to the April 9, 2012 incident, Ms. Briggs was free to call the police to report incidents of domestic violence or other criminal activity without risking the loss of her home. Ver. First Am. Compl. ¶¶ 49-50. Yet, when the police grew tired of responding to her home, they took affirmative and effective steps to silence her calls. They assigned her first strike on April 9, 2012, for having to respond to her home to protect her from her former boyfriend's violence. *Id.* ¶ 55. At that time, the Norristown police specifically instructed her that future calls to the police would lead to further strikes and ultimately her eviction. *Id.* ¶ 56. Thereafter, Ms. Briggs refused to call the police for any reason,

for fear that it could lead to the loss of her home.  When the police were called by neighbors on April 15 and May 2, 2012 to respond to additional incidents of domestic violence, the police assigned Ms. Briggs two more strikes, reinforcing Defendants' simple message that future calls to the police would lead to her eviction.  *Id.* ¶¶ 61, 64, 70, 75.  Defendants' message was made unambiguously clear during the May 23, 2012 meeting and subsequent letter decision issued by Defendant Forrest, in which he expressly informed Ms. Briggs and her landlord that if the police responded to any more incidents of "disorderly behavior" at the rental property during the 30-day probationary period, her landlord's rental license would be revoked and she would be evicted. *Id.* ¶¶ 84-86.

Ms. Briggs' abuser also heard Defendants' message loud and clear, and fully understood that Ms. Briggs could not call the police to report his acts of violence without risking eviction.  Emboldened by Ms. Briggs' effective inability to contact the police, her abuser continued to physically abuse Ms. Briggs with impunity.  Although Ms. Briggs attempted to break up with him and told him that he could not return upon receiving her second strike, her abuser was back within two weeks because he knew Ms. Briggs would not call the police.  *Id.* ¶ 89.  True to her abuser's understanding, Ms. Briggs refrained from calling the police during each of the subsequent incidents of domestic violence.  *Id.* ¶¶ 60, 70, 100.  Because she was afraid of being evicted, she even declined to call the police when she was brutally attacked and almost killed by her abuser on June 23, 2012.  *Id.* ¶ 100.  But for Defendants' overt actions, Ms. Briggs would have sought police protection against the repeated domestic violence perpetrated against her by her abuser.

Contrary to Defendants' unsupported claims, the facts pleaded in the Verified First Amended Complaint show that each of Defendants' affirmative actions and

communications to Ms. Briggs served to increase the risk of serious harm to Ms. Briggs.  With

each strike, Ms. Briggs became more fearful to contact the police.  With each strike, her abuser's

power over her grew and led to "an escalating series" of more frequent and more violent

episodes of abuse against Ms. Briggs.  *See, e.g., Okin*, 577 F.3d at 430 (holding that the state

actors' "conduct, both in response to that first complaint [of domestic violence] and thereafter,

could be viewed as ratcheting up the threat of danger to [the victim]").

    At this stage in the litigation, Defendants' reliance on *Phillips v. Northwest Reg'l

Communs.*, 391 Fed. Appx. 160 (3d Cir. 2010) (non-precedential) (affirming the district court's

grant of summary judgment when the plaintiff failed to produce evidence to support her claims

on remand in a prior proceeding), is misplaced.  As discussed above, it is clear under the Third

Circuit's earlier decision on a motion to dismiss in the same case that Ms. Briggs has alleged

more than sufficient facts to support her state-created danger claim.  *See Phillips v. County of

Allegheny*, 515 F.3d at 237 (reversing district court's grant of motion to dismiss and holding that

plaintiff had sufficiently alleged facts to prove a state-created danger claim, which required the

Third Circuit to "reverse the District Court's contrary determination").

    Defendants' reliance on *Bright v. Westmoreland County*, 443 F.3d 276, 282-83

(3d Cir. 2006) (affirming dismissal of complaint that alleged "state actor-defendants caused

[victim's] death" by delaying revocation of the perpetrator's parole and failing to follow-up with

the perpetrator after a confrontation with the police), and *Burella v. City of Philadelphia*, 501

F.3d 134, 147-48 (3d Cir. 2007) (holding plaintiff failed to state a state-created danger claim

when plaintiff did "not allege any facts that would establish that the officers did anything other

than fail to act"), is equally misguided.  Unlike the *Bright* and *Burella* plaintiffs, Ms. Briggs

alleges that it was Defendants' "misuse of state authority, rather than a failure to use it," *Bright*,

-50-

443 F.3d at 282, that violated her due process rights.  As discussed above, Defendants affirmatively instructed Ms. Briggs that any calls to the police could lead to her eviction, thereby discouraging her from calling the police to report incidents of domestic violence and emboldening her abuser to escalate each incident of abuse.  *See, e.g.*, *Pearce*, 473 Fed. Appx. at 19 (holding that plaintiff had sufficiently alleged a state-created danger claim, when defendants, among other things, engaged in a practice of "discouraging [domestic violence] victims from reporting abusive behavior").

Accordingly, Ms. Briggs has alleged more than sufficient facts to support her state-created danger claim due to Defendants' enforcement of the Old Ordinance.  Defendants' enactment and threatened enforcement of the New Ordinance continues to expose Ms. Briggs to an increased risk of further physical abuse at the hands of her former boyfriend (when he is released from prison), another companion, or even a stranger and, thus, supports Ms. Briggs' request for declaratory and injunctive relief.  *See, e.g., Builes v. Nye*, 239 F. Supp. 2d 518, 526 (M.D. Pa. 2003) (granting injunctive relief under the state-created danger theory because, absent injunctive relief, there was a high risk that petitioner would be tortured and killed if state action were allowed).

> **F.** **The Old Ordinance Violated and the New Ordinance Continues to Violate Ms. Briggs' Right to Equal Protection of the Laws as Protected by the Fourteenth Amendment of the United States Constitution.**

Defendants' enforcement of the Old Ordinance denied, and their enactment and threatened enforcement of the New Ordinance continues to deny, Ms. Briggs the right to the equal protection of the law, in violation of the Fourteenth Amendment.  *See, e.g., Hynson v. Chester Legal Dep't*, 864 F.2d 1026, 1031 (3d Cir. 1988) (establishing a standard in the Third Circuit for equal protection claims brought by domestic violence victims, and holding that

domestic violence victims can prevail on an equal protection claim if the plaintiff proffers

sufficient evidence that would allow a reasonable jury to infer that (1) it is the policy or custom

of the police to provide less protection to victims of domestic violence than to other victims of

violence, (2) that discrimination against women was a motivating factor, and (3) that the plaintiff

was injured by the policy or custom), *on remand,* 731 F. Supp. 1236, 1241 (E.D. Pa. 1990)

(applying the Third Circuit's guidance on remand and finding that plaintiff had adequately stated

equal protection claim).

   Courts have repeatedly recognized that plaintiffs who experience domestic

violence perpetrated by private individuals are able to bring equal protection claims based on

municipalities' discriminatory treatment of domestic violence victims.  *See, e.g.*, *Hynson*, 864

F.2d at 1030-31 (establishing the ability of a plaintiff to bring an equal protection claim based on

domestic violence (citing  *Watson v. City of Kansas City*, 857 F.2d 690, 690-96 (10th Cir.

1988))); *see also Estate of Macias v. Ihde*, 219 F.3d 1018, 1027-28 (9th Cir. 2000) ("There is a

constitutional right, however, to have police services administered in a nondiscriminatory

manner – a right that is violated when a state actor denies such protection to disfavored

persons.") (citing *Navarro v. Block*, 72 F.3d 712, 715-17 (9th Cir. 1995)); *Balistreri v. Pacifica

Police Dep't*, 901 F.2d 696, 701-02 (9th Cir. 1988) (holding that the district court abused its

discretion when it dismissed plaintiff's equal protection claim based on allegations surrounding

"police failure to respond to complaints lodged by women in domestic violence cases"); *Smith v.

City of Elyria*, 857 F. Supp. 1203, 1212 (N.D. Ohio 1994) (concluding evidence of

discriminatory intent was sufficient when it showed police treated complaints from domestic

violence differently from others); *Thurman v. City of Torrington*, 595 F. Supp. 1521, 1528-29

(D. Conn. 1984) (holding that the plaintiff had properly alleged that defendant municipality had

"a pattern or practice of affording inadequate protection, or no protection at all, to women who have complained of having been abused by . . . others with whom they have had close relations").

Here, there is no dispute that the Old Ordinance was and the New Ordinance is an official "policy or custom" of Norristown.  *See* Defs' Mot. to Dismiss Brief, at 41 ("Here, there is no question that the municipality of Norristown adopted an ordinance that would constitute a policy under *Monell*.").  Accordingly, *Burella v. City of Philadelphia*, 501 F.3d 134, 148-49 (3d Cir. 2007) (holding that plaintiff had failed to identify a policy or custom where police treated domestic violence less seriously when responding to incidents) is inapposite.  Contrary to Defendants' baseless assertions on pages 22 and 23 of their Motion to Dismiss Brief, both Ordinances (which are virtually identical) provide less protection to victims of domestic violence than victims of other crimes.  Indeed, both Ordinances explicitly target domestic violence as a form of "disorderly behavior" and affirmatively penalize victims of domestic violence with strikes and threaten them with eviction for reporting such incidents of domestic violence to the police.  As shown above, neither 18 Pa.C.S. § 2711(a) nor the Norristown Police Department's policy under General Order 2000-54 (individually or taken together) creates a "mandatory arrest" provision that would exclude calls for police assistance for domestic violence from being deemed a "strike" under Section B(2)(e) of either the Old or New Ordinances.  Moreover, as discussed above, the supposed "exceptions" to the Old and New Ordinances are devoid of any meaning.  Indeed, if, contrary to fact, any of these provisions actually protected victims of domestic violence in Norristown, such as Ms. Briggs, from application of the Old or New Ordinances when the police are called to protect them from being battered in their homes,

Defendants could not have enforced the Old Ordinance against Ms. Briggs for the violent incidents in April, May and June of 2012.

There is ample evidence that the Ordinances are motivated by discriminatory intent.  As discussed above, the Ordinances directly target incidents of domestic violence as "disorderly behavior" and affirmatively penalize victims of domestic violence for being subjected to such "disorderly behavior."  The Ordinances are thus premised on the gender stereotype that domestic violence victims should be held responsible for the conduct of their abusers, which federal courts have routinely held supports a finding of intentional discrimination. *See, e.g., Balistreri*, 901 F.2d at 701 (holding that an officer's comments, stating that he "did not blame plaintiff's husband for hitting her, because of the way she was 'carrying on,'" strongly suggested an intention to treat domestic violence claims less seriously than other assaults as well as an "animus against abused women"); *Watson v. City of Kansas City*, 857 F.2d at 696 (finding that training of officers that encouraged them to "defuse" domestic violence incidents was evidence of animus towards domestic violence victims); *Smith*, 857 F. Supp. at 1212 (finding that city's policy for handling domestic violence was evidence of differential treatment of women, "intended to 'accomplish the collateral goal of keeping women in a stereotypic and predefined place'"); *see generally* Elizabeth M. Whitehorn, Note, *Unlawful Evictions of Female Victims of Domestic Violence:  Extending Title VII's Sex Stereotyping Theories to the Fair Housing Act*, 101 Northwestern U. L. Rev. 1419 (2007).  Indeed, Defendants doggedly enforced the Old Ordinance against Ms. Briggs without any regard for the known violence being perpetrated against her by her former boyfriend and penalized her for being the victim of such violence.  Moreover, Defendants' feigned repeal of the Old Ordinance and "re-enactment" of the virtually identical New Ordinance, which continues to explicitly include domestic violence as a

form of "disorderly behavior" – after being educated by Plaintiffs' counsel of the Ordinance's

harmful effects on victims of domestic violence – can only be viewed as deliberate

discrimination against women (who make up the vast majority of domestic violence victims).

      Contrary to Defendants' tortured argument on page 23 of their Motion to Dismiss

Brief – that Ms. Briggs' injuries were solely caused by her former boyfriend – the Verified First

Amended Complaint plainly pleads that Ms. Briggs has suffered irreparable injuries to her

person and to her constitutional rights and that these injuries were proximately caused by

Defendants' enforcement of the Old Ordinance against her and threatened enforcement of the

New Ordinance.  Thus, Ms. Briggs has sufficiently alleged an Equal Protection claim.

    **G.**    **The Old Ordinance Fails to Provide and the New Ordinance**
        **Continues to Fail to Provide Notice of What Constitutes Disorderly**
        **Behavior and Results in Discriminatory Enforcement in Violation of**
        **the Fourteenth Amendment to the United States Constitution.**

      The Ordinances fail to provide Ms. Briggs and other Norristown tenants with

notice of what constitutes "disorderly behavior" and encourage discriminatory enforcement in

violation of the Fourteenth Amendment.  *See, e.g., City of Chicago v. Morales*, 527 U.S. 41, 52,

56 (1999) (invalidating an ordinance as impermissibly vague when "it leaves the public uncertain

as to the conduct it prohibits" and holding that a legislative enactment is void for vagueness

when it (1) "fail[s] to provide the kind of notice that will enable ordinary people to understand

what conduct it prohibits" or (2) "encourage[s] arbitrary and discriminatory enforcement").  The

Ordinances are impermissibly vague in two material respects.

      First, the Ordinances provide the Chief of Police with "sole discretion" to

determine whether any activity for which the police are called to respond constitutes "disorderly

behavior."  *See* Norristown Mun. Code § 245-3 (B)(2) (Exhibit A to the Ver. First Am. Compl.).

Although the Ordinances provide a non-exclusive list of the potential types of activity that could

be considered "disorderly behavior," there are no limits on the Chief of Police's authority to determine what types of conduct are "disorderly." *See, e.g., Morales*, 527 U.S. at 61-63 (striking down an ordinance that gave "absolute discretion to police officers to determine what activities" constituted a violation of the ordinance); *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (invalidating a statute that vest[ed] virtually complete discretion in the hands of the police to determine whether the suspect" satisfied the statute, further explaining that the statute had the "potential for arbitrarily suppressing First Amendment liberties") (internal citations omitted); *Kramer v. Price*, 712 F.2d 174, 176 (5th Cir. 1983) ("The absence of a determinate standard gives police officers, prosecutors, and the triers of fact unfettered discretion to apply the law, and thus there is a danger of arbitrary and discriminatory enforcement.").

Second, the Ordinances define "disorderly behavior" as any "activity that can be characterized as disorderly in nature." *See, e.g.* Section (I), Ordinance No 12-15, Exhibit J to the Ver. First Am. Compl. With such a circular definition, it is impossible for any reasonable person to know what could be considered "disorderly behavior" under the Ordinances. *See, e.g., Morales*, 527 U.S. at 60 (holding that the "Constitution does not permit a legislature to set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large"); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 166-167 (1972) (striking down an ordinance when "the list of crimes [was] so all-inclusive and generalized" that any action could be considered a violation of the ordinance).

Contrary to Defendants' unsupported statement on page 25 of their Motion to Dismiss Brief, Ms. Briggs herself did not know what conduct was considered "disorderly behavior" and could result in a strike under the Ordinances. Indeed, as discussed above, Ms.

Briggs reasonably believed that any call to the police could be considered to have involved "activity that can be characterized as disorderly in nature" and thus refrained from contacting the police to report the incidents of domestic violence perpetrated against her or any other criminal activity in her neighborhood, after she was assigned her first strike.  *See, e.g., Morales*, 527 U.S. at 57 (holding an ordinance invalid when it failed to distinguish what "is covered by the ordinance and what is not"); *see also Papachristou*, 405 U.S. at 170 (holding an ordinance invalid that used imprecise terms to capture any activity by certain city residents to suit state actors' desires to punish these individuals:  "Those generally implicated by the imprecise terms of the ordinance — poor people, nonconformists, dissenters, idlers — may be required to comport themselves according to the lifestyle deemed appropriate by the [municipality's] police . . .  It furnishes a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.").

The Court need not guess whether the Ordinances' vague and overbroad definition of "disorderly behavior" will result in arbitrary or discriminatory enforcement.  The facts pleaded in this case demonstrate the discriminatory nature of Defendants' enforcement under the Old Ordinance.  For example, the police were called to Ms. Briggs' home on at least eight different occasions for various incidents.  Ver. First Am. Compl. ¶¶ 49, 53, 61, 70, 100. Yet, remarkably, they only assigned strikes for the three incidents in April and May of 2012 that involved domestic violence.

Moreover, the Ordinances in this case must be subjected to a higher level of scrutiny because they implicate the fundamental First Amendment rights of Ms. Briggs and other tenants in Norristown.  *See, e.g., Smith v. Goguen*, 415 U.S. 566, 573 (1974) (holding that a statute that "is capable of reaching expression sheltered by the First Amendment" must define

offending behavior with "a greater degree of specificity than in other contexts"); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (holding that "a more stringent vagueness test should apply" to a law that infringes on First Amendment rights).  Here, the Ordinances cannot meet any standard of review because they fail to provide adequate notice of what constitutes "disorderly conduct" and have already resulted in discriminatory enforcement.

### H.   The Old Ordinance Discriminated and the New Ordinance Continues to Discriminate on the Basis of Sex in Violation of the Fair Housing Act.[18]

Ms. Briggs has more than adequately alleged that the Old Ordinance violated, and the New Ordinance continues to violate, the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604(a) & (b) and 3617, because, as discussed above with respect to Ms. Briggs' Equal Protection claim, the Ordinances intentionally discriminate against domestic violence victims and also have an inherently disparate impact on women, who make up the vast majority of domestic violence victims.[19]  *See, e.g., Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mt. Holly*, 658 F.3d 375, 381 (3d Cir. 2011) (holding that the "FHA can be violated by either intentional discrimination or if a practice has a disparate impact on a protected class"), *pet. for cert. pending*, No. 11-1507 (U.S. June 11, 2012); Sara K. Pratt, *U.S. Dep't of Hous. & Urban Dev., Office of Fair Hous. & Equal Opportunity, Assessing Claims of Housing Discrimination Against Victims of Domestic Violence under the Fair Housing Act and the Violence Against Women Act* (2011)

---

[18] Ms. Briggs respectfully withdraws her claims under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*, without prejudice.

[19] More recent statistics confirm that although the prevalence of domestic violence against men has increased, women experience extremely high and disproportionate rates of domestic and sexual violence.  *See U.S. Dep't of Health & Human Services, National Intimate Partner and Sexual Violence Survey: 2010 Summary Report*, at 18, 38-39, 54-55 (2011) (reporting that more than one in three women have experienced rape, physical violence, and/or stalking by an intimate partner in their lifetime, that nearly five times more women, compared to men, need medical care from domestic violence, and that thirteen times more women have been raped).  Intimate partner violence, rape, and stalking are even more prevalent among African-American women, American Indian women, and multi-racial women.  *See id.* at 20, 31.

(hereinafter "HUD Guidance") (setting out legal theories by which a domestic violence victim may bring a sex discrimination claim under the FHA).

HUD has set out three different legal theories under the FHA applicable to domestic violence victims.  First, there can be direct evidence of discrimination when there is a policy that is based on gender stereotypes about abused women.  HUD Guidance, at 4 ("For example, if a landlord tells a female domestic violence victim that he does not accept women with a history of domestic violence as tenants because they always go back to the men who abuse them, his statement is direct evidence of discrimination based on sex.").  Second, an FHA violation can arise when a defendant engages in unequal treatment of victims of domestic violence in comparison to victims of other crimes.  *See id.*  Lastly, because "statistics show that discrimination against victims of domestic violence is almost always discrimination against women," a disparate impact analysis is appropriate when a facially neutral housing policy disproportionately affects such victims.  *See id.* at 2, 5 ("Disparate impact cases often arise in the context of 'zero-tolerance' policies, under which the entire household is evicted for the criminal activity of one household member. . . . [A]s the overwhelming majority of domestic violence victims, women are often evicted as a result of the violence of their abusers."); *see also HUD Final Rule, Implementation of the Fair Housing Act's Discriminatory Effects Standard*, at 9 (2013) (citing to the HUD Guidance in a widely anticipated regulation on the disparate impact standard).[20]

---

[20] The HUD Guidance notes that an estimated 1.3 million women are the victims of assault by an intimate partner each year, that about one in four women will experience intimate partner violence in their lifetimes, and that eighty-five percent of victims of domestic violence are women.  *See id.* at 2 (citing *U.S. Dep't of Health & Human Services, Costs of Intimate Partner Violence Against Women in the United States* (2003); Callie Marie Rennison, *U.S. Dep't of Justice, Crime Data Brief: Intimate Partner Violence*, 1993-2001 (2003)).

Here, the Ordinances explicitly target domestic violence victims, hold such victims responsible for the abuse they experience, and impose penalties on such victims who seek police assistance for such "disorderly behavior."  Because the vast majority of domestic violence victims are women, the Ordinances discriminate on the basis of sex in violation of the FHA.  *See, e.g., Bouley v. Young-Sabourin*, 394 F. Supp. 2d 675, 677-78 (D. Vt. 2005) (holding that plaintiff had properly made a claim of sex discrimination in violation of the FHA when she alleged that "defendant attempted to evict her" after an incident of domestic violence); *Meister v. Kansas City, Kansas Hous. Auth.*, Case No. 09-2544-EFM, 2011 U.S. Dist. LEXIS 19166, at *19-20 (D. Kan. 2011) (denying defendant's motion for summary judgment and holding that "[u]nder the *Bouley* case, evidence that defendant knew that domestic violence caused damage to plaintiff's housing unit would help support a claim that she was evicted under circumstances giving rise to an inference of sex discrimination"); *Raab Family P'ship v. Borough of Magnolia*, Civil No. 08-5050 (JBS), 2009 U.S. Dist. LEXIS 11334, at *3-4 (D.N.J. Feb. 13, 2009) (holding that an ordinance that held landlords responsible for a tenant's alleged "disorderly conduct, nuisance and any other behavior or conduct which is a violation" of the municipal code was likely motivated by discrimination against a protected class in violation of the FHA and enjoining the ordinance's enforcement); Determination of Reasonable Cause, *Alvera v. Creekside Village Apartments*, No. 10-99-0538-8 (Dep't of Hous. & Urban Dev. Apr. 13, 2001) (establishing domestic violence victim's right to bring a sex discrimination claim under the FHA) (attached hereto as Exhibit 2).

Defendants' reliance on *Doe v. Butler*, 892 F.2d 315, 323 (3d Cir. 1989) (dismissing plaintiffs' FHA claim based on sex discrimination because the state action's impact on women "would have a comparable effect on males"), is misplaced because the FHA claims in

that case (a) were dismissed on summary judgment, not at the motion to dismiss stage, and (b) were decided prior to the HUD Guidance, establishing how discrimination against domestic violence victims can be a form of sex discrimination in violation of the FHA.  *See, e.g., Alvera*, No. 10-99-0538-8, at 6 (explaining that gender discrimination under the FHA can be shown when "[t]he evidence taken as a whole establishes that a policy of evicting innocent victims of domestic violence because of that violence has a disproportionate adverse impact on women").

Defendants misread Section 3604(a) and apply an unduly narrow concept of what "access" to housing means.  Section 3604(a) prohibits unlawful refusal to rent and ***otherwise making housing unavailable*** based on membership in a protected class.  Its coverage, therefore, is extremely broad.  Section 3604(a) not only prohibits discrimination in rental applications, but it also applies to other actions making housing unavailable, including evictions in the rental context.  *See* 24 C.F.R. § 100.60(b)(5) (mandating that a tenant may not be evicted because of gender).  Accordingly, Ms. Briggs' allegations – that Defendants' actions made housing unavailable to her by requiring her to choose between seeking the assistance of law enforcement and losing her home, forcing her to defend against a baseless eviction action, and threatening to revoke her landlord's license and forcibly remove her from the property – are more than sufficient to support a Section 3604(a) claim.  *See, e.g.*, *Harris v. Itzhaki*, 183 F.3d 1043, 1052 (9th Cir. 1999) (reversing dismissal of plaintiff's FHA claim when plaintiff alleged that defendant attempted to evict her due to her status as a member of a protected class); *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 986-87 (4th Cir. 1984) (same); *United States v. Lepore*, 816 F. Supp. 1011, 1024 (M.D. Pa. 1991) (holding that plaintiffs properly set forth FHA claim when the evidence showed defendants attempted to evict plaintiffs due to their status as members of a protected class).

Defendants similarly misinterpret the scope of Section 3604(b) and erroneously contend that the provision only applies if Defendants sold or rented property directly to Ms. Briggs.  Section 3604(b) prohibits discrimination in the terms, conditions, or privilege of rental of a dwelling, as well as the provision of services or facilities in connection with a dwelling because of gender, such as the provision of municipal services.  *See* 24 C.F.R. § 100.65(b)(4) (FHA prohibits "[l]imiting the use of privileges, services or facilities associated with a dwelling because of race, color, religion, sex, handicap, familial status, or national origin of an owner, tenant or a person associated with him or her"); 24 C.F.R. § 100.70(d)(4) (FHA prohibits "[r]efusing to provide municipal services or property or hazard insurance for dwellings or providing such services differently because of race, color religion, sex, handicap, familial status, or national origin").  The ability to seek ***access to Norristown's municipal police services*** is at the heart of Ms. Briggs' claims.  Accordingly, Ms. Briggs' allegations that Defendants discriminated against her on the basis of sex by precluding her from seeking the assistance of law enforcement are more than adequate to state a claim under Section 3604(b).

Indeed, this Court's holding in *Edwards v. Media Borough Council*, 430 F. Supp. 2d 445, 453 (E.D. Pa. 2006) (holding that "services generally provided by governmental units such as police and fire protection" fall within the FHA's anti-discrimination mandate and cannot be denied on the basis of membership in a protected class) – cited by Defendants on page 28 of their Motion to Dismiss Brief – directly supports this position.  *See also Campbell v. City of Berwyn*, 815 F. Supp. 1138, 1143-44 (N.D. Ill. 1993) (denying defendants' motion to dismiss when plaintiffs alleged that defendants terminated "police protection because of race" in violation of the FHA).

The District of New Hampshire's decision in *Barnette v. Pickering*, Civil No. 09-cv-264-PB, 2009 U.S. Dist. LEXIS 122587, at *5, 2010 WL 144359 (D.N.H. 2010) (dismissing plaintiff's complaint when she failed to allege that "she was discriminated against based on the race, gender, color, national origin, religion, or familial status of herself or any member of her household"), does not counsel a different result.  Although the complaint in that case appears to have asserted that the plaintiff was discriminated against because there was domestic violence in her home, the complaint did not assert any allegations that she was discriminated against as a victim of domestic violence based on any protected class – race, gender, color, national origin, religion, or familial status – that would support a Fair Housing Act claim.  *See id.* at *2.  By contrast, Ms. Briggs has specifically alleged how the Ordinances discriminate based on gender, and such claims have been sustained by the *Bouley* and *Meister* courts as well as HUD.

Because Ms. Briggs has stated a claim under Section 3604, her claim under Section 3617 should be allowed to move forward as well.  Section 3617 prohibits interference in enjoyment of any right guaranteed by sections 3603 through 3607.  Thus, Ms. Briggs can move forward with a Section 3617 claim because she alleged that Defendants interfered in her fair housing rights by discriminating against her based on gender in violation of Section 3604.  *See, e.g., Metropolitan Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1288 (7th Cir. 1977) ("Since the violation of section 3617 alleged in this case depends upon a finding that the Village interfered with rights granted or protected by section 3604(a), we can confine our inquiry to whether the [state action] made unavailable or denied a dwelling to any person because of [membership in a protected class] within the meaning of section 3604(a).").  Accordingly, Ms. Briggs has set forth more than sufficient allegations of intentional discrimination and disparate

impact in access to housing on the basis of sex in order to state a claim under the Fair Housing

Act.

I.    **The Old and New Ordinances Conflict with the Regulatory Scheme of the Violence Against Women Act in Violation of the Supremacy Clause of the United State Constitution.**

Both the Old and New Ordinances directly conflict with Congress' strong interest

in protecting victims of domestic violence under the Violence Against Women and Department

of Justice Reauthorization Act of 2005, P.L. 109-162, Title VI (2006) (hereinafter "VAWA

2005") (Section 8 protections previously codified at 42 U.S.C. § 1437f et seq.),[21] in violation of

the Supremacy Clause of the United States Constitution.  *See* U.S. Const. art. VI, cl. 2.

(providing that the laws of the United States "shall be the supreme Law of the Land . . . any

Thing in the Constitution or Laws of any State to the Contrary notwithstanding"); *Shaw v. Delta*

*Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (holding that "[i]t is beyond dispute that federal

courts have jurisdiction over suits to enjoin state officials from interfering with federal rights"

pursuant to the Supremacy Clause); *United States v. Chester*, 144 F.2d 415, 420 (3d Cir. 1994)

("A state statute, a local enactment or regulation or a city ordinance, even if based on the valid

police powers of a State, must yield in case of direct conflict with the exercise by the

Government of the United States of any power it possesses under the Constitution.") (internal

citations omitted).

VAWA specifically prohibits housing discrimination against and eviction of

victims of domestic violence based on the violence they have experienced.  *See, e.g., Metro N.*

*Owners, LLC v. Thorpe*, 870 N.Y.S.2d 768, 770 (N.Y. Civ. Ct. 2008) (rejecting owner's claim

---

[21] *See also* the Violence Against Women Act, Violence Against Women Reauthorization Act of 2013, P.L. 113-4, Title VI (2013)  (hereinafter, "VAWA 2013") (the current version of the Violence Against Women Act) (with VAWA 2005, collectively "VAWA").

that tenant created a nuisance based on a domestic violence incident and concluding that any

eviction would violate VAWA).  Indeed, VAWA provides that a tenant in a covered housing

program may not be evicted on the basis that the tenant is or has been a victim of domestic

violence, dating violence, sexual assault, or stalking.  *See* VAWA 2013 § 41411(b)(1);

previously 42 U.S.C. § 1437f(c)(9)(A).  VAWA further provides that incidents of actual or

threatened domestic violence shall not be construed as a serious or repeated violation of the lease

by the victim or threatened victim, or good cause for terminating the assistance, tenancy, or

occupancy rights of the victim of such violence.  *See* VAWA 2013 § 41411(b)(2); previously 42

U.S.C. § 1437f(c)(9)(B).  Moreover, VAWA provides that criminal activity directly relating to

domestic violence engaged in by a member of a tenant's household or any guest or other person

shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an

immediate member of the tenant's family is the victim or threatened victim of that domestic

violence.  *See* VAWA 2013 § 41411(b)(3)(A); previously 42 U.S.C. § 1437f(c)(i).  These

protections apply without regard to how many incidents of violence were perpetrated, whether or

not the police were ever called, whether a PFA was obtained, or whether or not an arrest

occurred.[22]  In light of VAWA's clear statutory language and underlying congressional purpose,

there is a direct conflict between VAWA's housing protections and the Ordinances.

Both of the Ordinances induce landlords in Norristown to terminate the tenancy of

victims who experience domestic violence where the police are called for three or more instances

of such "disorderly behavior."  Defendants vigorously enforced the Old Ordinance against Ms.

---

[22] While Congress specifically provided that states could legislate to further expand protections for
survivors beyond federal law (*e.g.,* so as to cover all private housing in a state and not just those receiving federal
subsidies), Congress set VAWA as the absolute floor for the housing rights of victims who live in covered
programs.  *See* VAWA 2013 § 41411(b)(2)(C)(iv) ("[n]othing in subparagraph A [referring to housing protections]
shall be construed . . . to supersede any provision of any Federal, State, or local law that provides *greater* protection
than this section for victims of domestic violence, dating violence, sexual assault, or stalking") (emphasis added);
previously 42 U.S.C. § 1437f(ee)(1)(F) (same).

Briggs, a Section 8 voucher holder, after she experienced incidents of domestic violence and coerced her landlord into filing eviction proceedings against her based on that violence, creating a situation whereby it was impossible to both comply with the Old Ordinance and protect the housing of the victim, as required by VAWA.  *See, e.g., Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 873 (2000) (holding that when it is "'impossible' for private parties to comply with both state and federal law . . . conflicting state law [is] 'nullified' by the Supremacy Clause").

Moreover, the New Ordinance continues to present barriers to effectuating the rights of domestic violence victims laid out in VAWA.  For example, HUD requires that owners covered by VAWA – such as Section 8 landlords – enter into leases with all tenants that incorporate the VAWA protections, including the prohibition on terminating tenancy based on domestic violence.  *See* HUD Form 52641-A ¶ 8e.  Yet, the New Ordinance calls on landlords to adopt contradictory lease provisions that would allow for eviction based on "disorderly behavior" such as domestic violence.  *See* Section (I), Ordinance No. 12-15, Exhibit J to the Ver. First Am. Compl. ("It is strongly encouraged that all licenses include in their leases language that provides that it is a breach of the lease for a tenant to be convicted for disorderly behavior.").  Thus, the New Ordinance remains a major obstacle to meaningful enforcement of the protections enacted in federal law.  Accordingly, the Ordinances, which discriminate against and specifically contemplate eviction of domestic violence victims based on such "disorderly behavior," are directly preempted by VAWA's housing protections.[23]

---

[23] To Plaintiff's counsel's knowledge, the preemptive effect of the VAWA housing protections is an issue of first impression.  Although Ms. Briggs asserts that VAWA preempts the Ordinances in every way, at a minimum, implied conflict preemption applies here.  *See, e.g., Hines v. Davidowitz,* 312 U.S. 52, 67 (1941) (holding implied conflict preemption occurs where local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").  The Ordinances present a significant obstacle to domestic violence victims seeking to avail themselves of the protection under VAWA.  *See generally Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.").

Ms. Briggs' VAWA claim rests on preemption under the Supremacy Clause, which Defendants erroneously conflate with enforceability via Section 1983. Yet, the law is clear that preemption claims may be pursued even if the plaintiff does not have a cause of action under Section 1983.[24] *See, e.g., Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107-08 (1989) (allowing plaintiff to proceed on pre-emption claim and holding: "Given the variety of situations in which preemption claims may be asserted, in state court and in federal court, it would obviously be incorrect to assume that a federal right of action pursuant to § 1983 exists every time a federal rule of law pre-empts state regulatory authority. Conversely, the fact that a federal statute has pre-empted certain state action does not preclude the possibility that the same federal statute may create a federal right for which § 1983 provides a remedy."). Accordingly, Plaintiff has properly stated a preemption claim based on VAWA.

**J.      Ms. Briggs May Seek an Order Enjoining Enforcement of the New Ordinance Under the Pennsylvania Constitution.**

Because Ms. Briggs is seeking to enjoin the New Ordinance – as well as recover damages for the harm she suffered as a result of Norristown's enforcement of the Old Ordinance against her – her claims that the New Ordinance violates numerous provisions of the Pennsylvania Constitution may be considered in determining whether to enjoin enforcement of the New Ordinance. The law is clear that "individual plaintiffs may bring suit for injunctive relief under the Pennsylvania Constitution." *E.g., Moeller v. Bradford County*, 444 F. Supp. 2d

---

[24] Plaintiff disagrees with Defendants' contention that VAWA is not enforceable via Section 1983. The case cited by Defendants – *Reynolds v. PGB Enterprises, LLC*, 2011 WL 2678589 (E.D. Pa. 2011) (Pollak, J.) – did not address the VAWA housing protections. Judge Pollak's discussion of 42 U.S.C. § 1437f focuses on one specific subsection of § 1437f that deals with inspection of units. *See id.* at *8 (discussing subsection (o)). In any case, Congress consolidated VAWA's protections in the recent reauthorization – including those applicable to tenants with Section 8 vouchers – to 42 U.S.C. § 14043e (2013). *See* Violence Against Women Reauthorization Act of 2013 § 601, P.L. 113-4 (2013). Any analysis of the Section 1983 enforceability of VAWA's housing protections must be based on that statutory language. Because the plaintiff does not seek to enforce VAWA via Section 1983, however, this court need not reach that issue.

316, 320–21 (M.D. Pa. 2006) (refusing to dismiss plaintiffs' Pennsylvania constitutional claims

and holding that plaintiffs properly brought a claim for injunctive relief under the Pennsylvania

Constitution (citing *Klump v. Nazareth Area Sch. Dist.*, 425 F. Supp. 2d 622, 629 (E.D. Pa.

2006))); *see also Pocono Mountain Charter Sch. v. Pocono Mountain School Dist.,* 442 Fed.

Appx. 681, 688 (3d Cir. 2011) (recognizing availability of equitable relief under the

Pennsylvania Constitution and remanding case where district court failed to consider plaintiff's

claims for injunctive relief); *Jones v. City of Philadelphia*, 890 A.2d 1188, 1208, 1216 (Pa.

Cmwlth. 2006) (holding declaratory and injunctive relief is available to remedy a violation of the

Pennsylvania Constitution).  Defendants do not – and cannot – provide any valid basis for the

dismissal of Ms. Briggs' Pennsylvania constitutional claims.

> **K.**     **The Individual Defendants Are Not Entitled to Qualified Immunity.**

            None of the individual Defendants are entitled to qualified immunity for the

claims against them seeking declaratory and injunctive relief.  Only defendants against whom

damages are sought may assert the defense of qualified immunity.  *See, e.g.*, *Camreta v. Greene*,

131 S. Ct. 2020, 2031 n.5 (2011) (noting that qualified immunity is not available in suit to enjoin

future conduct); *Flagner v. Wilkinson*, 241 F.3d 475, 483 (6th Cir. 2001) ("The defense of

qualified immunity protects officials from individual liability for money damages but not from

declaratory or injunctive relief."); *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518,

527 (9th Cir. 1989) ("Qualified immunity is an affirmative defense to damage liability; it does

not bar actions for declaratory or injunctive relief."); *N.N. v. Tunkhannock Area School Dist.*,

801 F. Supp. 2d 312, 317 (M.D. Pa. 2011) ("qualified immunity only appl[ies] when monetary

damages are sought").  Accordingly, Defendants Glisson and Richet are not entitled to qualified

immunity because Ms. Briggs has not made any claims for damages against them but instead

seeks declaratory and injunctive relief to preclude them from enforcing the New Ordinance.  For

the same reason, Defendants Bono, Januzelli and Forrest are not entitled to qualified immunity for any of Ms. Briggs' claims made in support of her request for declaratory and injunctive relief.

Defendants Forrest, Bono and Januzelli also cannot establish that they are entitled to qualified immunity for any of the damages claims being asserted against them. *See, e.g., Burns v. Pa. Dept. of Corrections*, 642 F.3d 163, 176 (3d Cir. 2011) (holding that "[t]he burden of establishing qualified immunity falls to the official claiming it as a defense"). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction and liability when they perform their duties reasonably." *See, e.g., Pearson v. Callahan*, 555 U.S. 223, 230 (2009). Here, Defendants Forrest, Bono and Januzelli do not – and cannot – show under the facts pleaded that reasonable officials in their positions would have believed that the actions they took in enforcing the Old Ordinance against Briggs were constitutional.

Defendants' reliance on the *Bloomsburg* and *Berwick* decisions to excuse their unconstitutional conduct is misplaced, because neither of those cases involved claims that the ordinances at issue there chilled tenants' First Amendment rights to call the police, as discussed above. Here, Defendants Bono, Januzelli, and Forrest each took deliberate actions to chill Briggs from exercising her First Amendment right to call the police – actions that no reasonable official would consider constitutional.

Contrary to Defendants' unsupported statements on pages 37 through 40 of Defendants' Motion to Dismiss Brief, the Verified First Amended Complaint more than sufficiently alleges that Defendants Bono, Januzelli, and Forrest were directly responsible for the violations of Ms. Briggs' constitutional rights by rabidly enforcing the Old Ordinance against her. For example, Defendant Bono, as Chief of Police, had unfettered discretion to determine

whether the incidents to which police responded at Ms. Briggs' residence violated the Old

Ordinance's ban on "disorderly behavior."  Ver. First Am. Compl. ¶ 39.  Defendant Bono was

also present at the May 23, 2012 meeting that Ms. Briggs attended with her landlord and borough

officials, during which her landlord asked the borough to reconsider its decision requiring him to

evict Ms. Briggs or lose his rental license for the property.  *Id.* ¶ 76.  At that meeting, Defendant

Bono demonstrated that he had knowledge of the conduct that triggered the strikes, and he

ratified the decision to classify that conduct as "disorderly" under the Old Ordinance.  *Id.* ¶¶ 79-

80.  Defendant Januzelli was also present at the meeting.  *Id.* ¶ 76.  As Norristown's Municipal

Code Manager, he had responsibility for enforcing the Old Ordinance against Ms. Briggs and her

landlord.  *Id.* ¶ 36.  The actions of both Defendants Bono and Januzelli in enforcing the Old

Ordinance were directly responsible for the violation of Ms. Briggs's constitutional rights.

   Defendant Forrest was also present at the May 23 meeting.  *Id.* ¶ 76.  As

Municipal Administrator, Forrest was responsible for deciding whether and when to revoke or

suspend rental licenses and whether and when to condemn private property and declare it

unlawful to occupy the property as a rental unit.  *Id.* ¶ 32.  Following the May 23 meeting,

Defendant Forrest issued a letter decision to Ms. Briggs' landlord placing the rental property on

probationary status and declaring that any further "disorderly behavior" during the 30-day period

would result in suspension or revocation of the rental license.  *Id.* ¶ 85.  Three days after Ms.

Briggs was brutally attacked, stabbed and almost killed, on or about June 26, 2012, Defendant

Forrest told Ms. Briggs' landlord that his rental license was revoked and that Ms. Briggs had ten

days to vacate the property.  *Id.* ¶ 104.  Defendant Forrest's decision to revoke Ms. Briggs'

landlord's rental license was directly responsible for the eviction proceedings that her landlord

filed against her.  When those eviction proceedings were unsuccessful – because the District

Justice refused to grant Ms. Briggs' landlord an order of possession – Defendant Forrest then informed Ms. Briggs' landlord that, unless Ms. Briggs vacated the property voluntarily, the borough would condemn her home as "unlawful" and remove her for trespassing.  *Id.* ¶ 115.  Defendant Forrest's actions were directly responsible for deterring Ms. Briggs from exercising her First Amendment right to call the police.  Defendants' claim that a reasonable official in Defendant Forrest's position would not understand that threatening a victim of domestic violence with eviction if the police were called to her residence would chill her from exercising her First Amendment right to call the police and create a foreseeable risk of harm to her defies clearly established case law and common sense.

Defendants' contention that they are entitled to qualified immunity because they were merely enforcing an ordinance is contrary to the pleaded facts and applicable law.  Both the Old and New Ordinances plainly state that the Chief of Police has "sole discretion" to determine whether the behavior at a tenant's home is "disorderly," thus triggering application of penalties under the Ordinances.  Accordingly, it was within Defendant Bono's discretion to decide whether the incidents at Ms. Briggs' home were "disorderly" under the Old Ordinance; he was not merely following the law's requirements.  Even if the Old Ordinance did not accord any discretion to Defendants, their mere enforcement of the Old Ordinance would not make their conduct *per se* reasonable.  *See, e.g.*, *Lawrence v. Reed*, 406 F.3d 1224, 1233 (10th Cir. 2005) (holding Chief of Police, who caused violation of plaintiff's Fourth Amendment rights by ordering seizure of vehicles from her property, was not entitled to qualified immunity, notwithstanding fact that he relied on derelict vehicle ordinance that authorized warrantless seizure of vehicles without any pre- or post-deprivation hearing, because he should have known that ordinance was unconstitutional).  "[I]ndividuals cannot always be held immune for the

results of their official conduct simply because they were enforcing policies or orders promulgated by those with superior authority."  *E.g., Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994).  When a law authorizes conduct that patently violates the Constitution, "officials are not entitled to turn a blind eye to its obvious unconstitutionality and then claim immunity" based on the law.  *See, e.g., Roska v. Sneddon*, 437 F.3d 964, 972 (10th Cir. 2006).  Accordingly, the fact that Defendants Forrest, Bono and Januzelli were acting pursuant to the Old Ordinance does not shield them from individual liability for their unconstitutional conduct.

     **L.**     **Norristown Is Subject to Municipal Liability and the Individual Defendants Are Subject to Liability in their Official Capacities.**

There is no dispute that the Ordinances at issue in this case are official policies of Norristown under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) (reversing the dismissal of plaintiffs' Section 1983 claims when plaintiffs' "case unquestionably involve[d] [a local government's] official policy as the moving force of the constitutional violation").  *See* Defs' Mot. to Dismiss Brief, at 41 ("Here, there is no question the municipality of Norristown adopted an ordinance that would constitute a policy under *Monell*.  Clearly, this ordinance was adopted by the legislative body of Norristown . . . .").  Contrary to Defendants' unsupported statements on pages 41 and 42 of their Motion to Dismiss Brief, Defendants' affirmative actions in enforcing, and enacting and threatening to enforce, the Ordinances (both official policies of Norristown) directly caused and continue to cause significant and irreparable injuries to Ms. Briggs fundamental, constitutional rights, as discussed at length above.  Accordingly, Ms. Briggs' has properly asserted municipal liability against Norristown and liability against the individual Defendants in their official capacities with respect to her Section 1983 claims under *Monell*.

## IV.     CONCLUSION

For the foregoing reasons Ms. Briggs respectfully requests that the Court deny

Defendants' Motion to Dismiss.

Dated:  June 3, 2013                                   Respectfully submitted,


/s/ Sara J. Rose                              /s/ Peter M. Smith
Witold J. Walczak (PA 62976)                  M. Duncan Grant (PA 21726)
Sara J. Rose (PA 204936)                      Peter M. Smith (PA 93630)
American Civil Liberties Foundation           Matthew E. Levine (PA 309419)
of Pennsylvania                               T. Stephen Jenkins (PA 311104)
313 Atwood Street                             PEPPER HAMILTON LLP
Pittsburgh, PA  15213                         3000 Two Logan Square
412.681-7864 (telephone)                      Eighteenth & Arch Streets
412.681.8707 (facsimile)                      Philadelphia, PA  19103-2799
vwalczak@aclupa.org                           215.981.4000 (telephone)
srose@aclupa.org                              215.981.4750 (facsimile)
                                              grantm@pepperlaw.com
/s/ Sandra S. Park                            smithpm@pepperlaw.com
Sandra S. Park                                levinem@pepperlaw.com
Lenora M. Lapidus                             jenkinst@pepperlaw.com
American Civil Liberties Union
Women's Rights Project
125 Broad St. 18th Fl.
New York, NY 10004
212.519.7871 (telephone)
212.549.2580 (facsimile)
spark@aclu.org
llapidus@aclu.org


*Attorneys for Plaintiff Lakisha Briggs*

## <u>CERTIFICATE OF SERVICE</u>

I, Peter M. Smith, hereby certify that on June 3, 2013 a true and correct copy of

the foregoing Plaintiff Lakisha Briggs' Response in Opposition to Defendants' Motion to

Dismiss Plaintiff's First Amended Complaint was served via ECF and email upon the following:

Robert P. DiDomenicis, Esquire
Holsten & Associates
One Olive Street
Media, PA 19063
(610) 566-8800
rdidomenicis@holstenassoc.com


/s/ Peter M. Smith
Peter M. Smith

# Exhibit 1



AMERICAN BAR ASSOCIATION
COMMISSION
ON DOMESTIC VIOLENCE

### Domestic Violence Arrest Policies by State          11/07

| State | DV Arrest Policy | Relevant Statute |
|---|---|---|
| Alabama | Officer's Discretion | Ala. Code 1975 § 15-10-3 (A)(8) |
| Alaska | Mandatory Arrest | Alaska Stat. § 18.65.530 (A) |
| Arizona | Mandatory Arrest | Ariz. Rev. Stat. Ann. § 13-3601 (B) |
| Arkansas | Pro-Arrest | Ark. Code Ann. § 16-81-113 (A)(1)(A) |
| California | Pro-Arrest | Cal. Penal Code § 836 (D) |
| Colorado | Mandatory Arrest | Colo. Rev. Stat. § 18-6-803.6 |
| Connecticut | Mandatory Arrest | Conn. Gen. Stat. Ann. § 46b-38b (A) |
| Delaware | Officer's Discretion? | Del. Code Ann. Tit 11 § 1904 (reasonable grounds) |
| DC | Mandatory Arrest | D.C. Code Ann. § 16-1031 |
| Florida | Pro-Arrest | Fla. Stat. Ann. § 741.29 (4)(B) |
| Georgia | Officer's Discretion | Ga. Code Ann., § 17-4-20 (A) |
| Hawaii | Officer's Discretion? | HI St § 803-5 (broad statute) |
| Idaho | Officer's Discretion | I.C. § 19-603 |
| Illinois | Officer's Discretion | 750 IICS 60/301 |
| Indiana | Officer's Discretion | IC 35-33-1-1 (1)(A)(5)(B) |
| Iowa | Mandatory Arrest | Iowa Code Ann. §§ 236.12 (2); 804.7 (5) |
| Kansas | Mandatory Arrest | Kan. Stat. Ann. § 22-2307 (B)(1) |
| Kentucky | Officer's Discretion | KRS § 403.785 (2) |
| Louisiana | Mandatory Arrest | La. Rev. Stat. Ann. § 46-2140 (1)(aggravated or second degree battery), (2)(danger to victim exists where assault or simple battery occurred) |
| Maine | Mandatory Arrest | Me. Rev. Stat. Ann. Tit 19-A § 4012 (5) |
| Maryland | Officer's Discretion | Md. Crim. Proc. § 12-204 (A)(1)(I), (Ii) |
| Massachusetts | Pro-Arrest | Mass. Gen. Laws Ann. Ch. 209a § 6 |
| Michigan | Pro-Arrest | Mich. Stat. Ann. §§ 28.874 (1), 28.1274(3) |
| Minnesota | Officer's Discretion | Minn. Stat. Ann. § 609.341 |
| Mississippi | Mandatory Arrest | Miss. Code Ann. § 99-3-7 (3) |
| Missouri | Officer's Discretion | V.A.M.S. 455.085 |
| Montana | Pro-Arrest | Mo. Rev. Stat. § 455.085.1 (requiring arrest for a second domestic violence incident within 12 hours); Mont. Code Ann. § 46-6-311 (2)(A) |
| Nebraska | Officer's Discretion | NE St § 29-404.02 (1) |
| Nevada | Mandatory Arrest | Nev. Rev. Stat. § 171.137 |
| New Hampshire | Officer's Discretion? | N.H. Rev. Stat. Ann. § 594:10 (I)(B); N.H. Rev. Stat. Ann. § 173-B:9 (is ambiguous in directing that an officer "should" arrest the primary aggressor in the context of a discretionary arrest directive for domestic violence generally) |
| New Jersey | Mandatory Arrest? | N.J. Stat. Ann. § 2c:25-21(mandates warrantless arrest only where injury resulted or weapon was used; may, in practice, be applied only in felony-level assaults) |
| New Mexico | Officer's Discretion | N.M.S.A. 1978, § 31-1-7 (A) |
| New York | Mandatory Arrest | N.Y. Crim. Proc. Law § 140.10 (4)(C) |
| North Carolina | Officer's Discretion | N.C.G.S.A. § 15a-401 |
| North Dakota | Pro-Arrest | N.D. Cent. Code § 14-07.1-11 (2); N.D. Cent. Code § 14-07.1-10 (setting forth presumptive arrest policy) |
| Ohio | Mandatory Arrest? | Ohio Rev. Code Ann. § 2935.032 (A)(1)(A); Ohio Rev. Code Ann. § 2935.03 (B)(3)(B) (provides for a preferred arrest policy when there is "reasonable grounds" to arrest; however, when there is probable cause to arrest, arrest is mandatory) |

Prepared by the American Bar Association Commission on Domestic Violence  http://www.abanet.org/domviol

**The law is constantly changing!  Please independently confirm the data you find here.**

We are always grateful to receive corrections and updates at abacdvta@abanet.org



**Domestic Violence Arrest Policies by State**          11/07

| State | DV Arrest Policy | Relevant Statute |
|---|---|---|
| Oklahoma | Officer's Discretion | Okla. Stat. Tit. 22 § 40.3 |
| Oregon | Mandatory Arrest | Or. Rev. Stat. § 133.055 (2)(A) |
| Pennsylvania | Officer's Discretion | 18 Pa. Cons. Stat. Ann. § 2711 |
| Rhode Island | Mandatory Arrest | R.I. Gen. Laws § 12-29-3 |
| South Carolina | Mandatory Arrest | S.C. Code Ann. § 16-25-70 |
| South Dakota | Mandatory Arrest | S.D. Codified Laws Ann. §§ 23a-3-2.1 |
| Tennessee | Pro-Arrest | Tenn. Code Ann. § 36-3-619 |
| Texas | Officer's Discretion | Vernon's Ann.Texas C.C.P. Art. 14.03 (A)(4) |
| Utah | Mandatory Arrest | Utah Code Ann. § 77-36-2.2 |
| Vermont | Officer's Discretion | VT RCRP Rule 3 |
| Virginia | Mandatory Arrest? | Va. Code Ann. § 19.2-81.3(authorizes officer discretion to determine whether "special circumstances" exist that dictate alternatives to arrest be used) |
| Washington | Mandatory Arrest | Wash. Rev. Code Ann. §10.31.100 (2) |
| West Virginia | Officer's Discretion | W. Va. Code, § 48-27-1002 |
| Wisconsin | Pro-Arrest | Wis. Stat. Ann. § 968.075(3) |
| Wyoming | Officer's Discretion | Wyo. Stat. § 7-20-102 |

Prepared by the American Bar Association Commission on Domestic Violence  http://www.abanet.org/domviol

**The law is constantly changing!  Please independently confirm the data you find here.**

We are always grateful to receive corrections and updates at abacdvta@abanet.org

# Exhibit 2

## DETERMINATION OF REASONABLE CAUSE

CASE NAME:  Alvera v Creekside Village Apartments
CASE NUMBER:  10-99-0538-8

## I. JURISDICTION

A complaint was filed with the Department on October 22, 1999, alleging that Ms.
Tiffani Ann Alvera, the complainant, was injured by a discriminatory act by the
respondents, Creekside Village Apartments, a California Limited Partnership; General
Partners Edward and Dorian Mackay; The CBM Group, Inc.; and CBM Group employees
Karen Mock, Resident Manager of Creekside Village Apartments, and Inez Corenevsky,
Supervising Property Manager. It is alleged that the respondents were responsible for a
discriminatory refusal to rent and discriminatory terms, conditions, privileges, or services
and facilities, in violation of Sections 804 (a) and (b) of the Fair Housing Act. The most
recent discriminatory act was alleged to have occurred on September 7, 1999. The
property is Creekside Village Apartments, 1953 Spruce Drive, Seaside, Oregon. The
property is not exempt under the Act.

The respondents receive federal financial assistance from the United States Department of
Agriculture, Rural Development.

## II. COMPLAINANT'S ALLEGATIONS

Ms. Alvera alleged that on August 2, 1999, her husband physically assaulted her in their
home, apartment 21 in Creekside Village Apartments. Her husband was jailed and Ms.
Alvera obtained a temporary restraining order against him. On August 4, 1999, Ms.
Alvera alleged, she received a 24 hour notice to vacate from management that stated that,
pursuant to Oregon law: "You, someone in your control, or your pet, has seriously
threatened immediately to inflict personal injury, or has inflicted substantial personal
injury upon the landlord or other tenants." The notice specified that the incident was the
assault on Ms. Alvera by her husband. Ms. Alvera alleged further that after issuing the
notice, the managers refused to accept her rent for September. The managers also refused
to move her to a one bedroom apartment; since her husband was not to live with her any
more, she believed that she no longer qualified for a two bedroom apartment in this
USDA subsidized complex. Ms. Alvera alleged that management discriminated against
her because of her sex because the way they interpret and enforce Oregon state law
toward domestic violence victims has a greater negative impact on women. She also
alleged that management would not have treated men the same way as she was treated.

## III. RESPONDENTS' DEFENSES

The respondents defended that they gave Ms. Alvera a 24 hour notice to vacate because it is their policy to evict tenants who pose a threat to the safety and well-being of other tenants in the complex. When one person in the household poses a threat, the entire household is evicted.

## IV. FINDINGS AND CONCLUSIONS

The investigation revealed that the subject property consists of forty units and is funded by the USDA Rural Development program. The property is intended to serve lower income residents.

The investigation found that Ms. Alvera and her former husband, Mr. Humberto Mota, signed a lease and moved into a two bedroom unit at the complex in November, 1998. Until the incident from which this complaint arises, Ms. Alvera received no warnings or admonitions concerning her tenancy from the respondents. During this period Mr. Mota assaulted Ms. Alvera, who called the police. However, the respondents apparently were not aware of this incident and no action was taken with respect to their tenancy. In March, 1999, respondent Karen Mock became the resident manager of Creekside Village Apartments.

The evidence shows that on August 2, 1999, at approximately 5:30 am, Mr. Mota physically assaulted Ms. Alvera, causing Ms. Alvera to go to the hospital. Her mother, Tamie Alvera, who resided in unit 30 in the complex, at approximately 6:00 am, went to Ms. Mock in order to get a key to her daughter's apartment so that she could see whether Mr. Mota was still in the apartment. At the time, Tamie Alvera told Ms. Mock that Ms. Alvera had been beaten by Mr. Mota. Ms. Mock wrote up an incident report and sent it to respondent Corenevsky The investigation revealed that immediately after she was released from the hospital, Ms. Alvera obtained a restraining order against her husband, which she showed to Ms. Mock. The restraining order stated that Mr. Mota could not contact Ms. Alvera at her residence, place of business, or within 100 feet of Ms. Alvera and could not contact her by phone or mail. The order also stated that Mr. Mota would move from and not return to their residence. Ms. Alvera discussed with Ms. Mock removing Mr. Mota from the lease.

The investigation revealed further that Ms. Mock was instructed by Ms. Corenevsky to terminate Ms. Alvera's tenancy and issue a 24 hour for cause eviction notice. On August 4, 1999, CBM Group issued a 24 hour notice to Ms. Alvera and Mr. Mota. The notice stated: "You, someone in your control, or your pet, has seriously threatened immediately to inflict personal injury, or has inflicted substantial personal injury upon the landlord or other tenants." The notices specified: "On August 2, 1999 at approximately 6 am. Humberto Mota reportedly physically attacked Tiffani Alvera in their apartment. Subsequently, Police were called in."

2

The investigation established that on August 4, 1999, Ms. Alvera made an application for a one bedroom unit at the complex because there was then only one member of the household. The evidence shows that this application was rejected by the respondents because of the incident of domestic violence for which Ms. Alvera received the 24 hour notice. The evidence showed that unit 18, a one bedroom apartment into which Ms. Alvera eventually moved, was available as of August 4, 1999. On October 8, 1999, Ms. Alvera submitted a second application for a one bedroom apartment. On November 2, Ms. Alvera signed a lease for a one bedroom apartment, where she resided until she was later evicted for reasons not directly related to the allegations of this complaint.

The evidence further revealed that on August 6, 1999, Ms. Mock refused to accept Ms. Alvera's rent for the month of August. The respondents communicated to Ms. Alvera up through early September, 1999 that they intended to pursue an FED action against her. On October 26, 1999, an attorney representing the respondents wrote Ms. Alvera "concerning your Rental Agreement of [unit 21]." The letter stated:

> "As you know, there was a recent incident of violence that took place between you and another member of your household. It is our understanding that you have taken steps to ensure that such an incident will not occur again.
>
> This letter is to advise that Creekside is very concerned about the effect of such conduct on other tenants of the premises. Your conduct and the conduct of the other tenant would probably have been grounds for termination of your tenancy. Obviously, Creekside would not desire to take this action.
>
> This letter is to advise that if there is any type of reoccurrence of the past events described above, that Creekside would have not other alternative but to cause an eviction to take place. We solicit your cooperation in continuing to maintain a restraining order or for you to take whatever action is necessary to make certain that the rules of your tenancy are followed."

There is no dispute that the sole reason for the 24 hour notice was respondents' response to this incident of domestic violence. The evidence shows that none of the other tenants complained to the respondents that their tenancy had been disrupted or that they had been injured or feared injury because of the incident. Ms. Mock stated that after Ms. Alvera vacated the apartment a hole in the wall, which might have been caused by an assault by Mr. Mota, was discovered, but that she learned of this damage long after the 24 hour notice had been issued and that she did not report the hole to her superiors.

The investigation did not establish that Ms. Alvera was treated differently than similarly situated male tenants. There were no similarly situated male tenants. The evidence also

revealed that there were at least three incidents of domestic violence at Creekside Village Apartments, all involving female victims, but respondents knew only about the August, 1999 incident involving Ms. Alvera. The evidence showed that the respondents issued three other 24 hour notices. One notice was for criminal activity, one was because the INS took the entire family away, and one was because a tenant threatened other tenants with a baseball bat. The evidence also showed that the resident manager filed six incident reports with upper management during the period June 1, 1999 to January 31, 2000. The only incident report involving violence, domestic or otherwise, was that involving Ms. Alvera.

It is the respondents' policy, expressed by respondent Corenevsky, that where there is any threat or act of violence by a tenant or their guest, the household is terminated. She stated that the subject property has a "zero tolerance" for violence or threats of violence, and this policy was affirmed by the ADA/504 Coordinator for CBM Group. Ms. Corenevsky stated: "As is often the case in a domestic violence situation the victim does not take steps to prevent a reoccurrence of violent acts, subjecting other tenants to witness the scene play out time and time again. The reasons we take such a hard stance on the issue of violence is to maintain a peaceful living environment for all tenants."

Nationally, each year from 1992 to 1996 about 8 in 1,000 women and 1 in 1,000 men experienced a violent victimization by an intimate—a current or former spouse, girlfriend or boyfriend. National statistics also showed that, although less likely than males to experience violent crime overall, females are 5 to 8 times more likely than males to be victimized by an intimate. Other national studies have found that women are as much as ten times more likely than men to be victimized by an intimate.

National statistics show that 90% to 95% of victims of domestic violence are women. National estimates are that at least one million women a year are victims of domestic violence. A 1998 Oregon Domestic Violence Needs Assessment stated that more than one in eight (13.3 %) women in the state were the victims of physical abuse by an intimate in the prior year. Evidence obtained during the investigation showed that 93% of the victims of domestic violence reported to Clatsop County in 1999 were women. The 1998 Oregon Domestic Violence Needs Assessment compared the Oregon statistics to national statistics on the prevalence of domestic violence and found them to be comparable. National studies using a similar methodology reported that 1 out of every 9 to 1 out of every 12 women had been victims of physical assault by an intimate partner within the previous year. This compares to the Oregon study's finding that 1 of every 10 Oregon women have been victims of physical assault.

These statistics demonstrate that the respondents' policy of evicting all members of a household because of an incident of domestic violence, regardless of whether the household member is a victim or a perpetrator of the domestic violence, has an adverse impact based on sex, because of the disproportionate number of women victims of domestic violence.

4

The respondents have raised several reasons for their policy. One rationale advanced by the respondents is the need to protect other tenants both from threats of violence or violence and from being disturbed in their tenancy. However, the evidence fails to support this rationale. In the case of Ms. Alvera, no other tenants complained about the incident in question and the evidence shows that the only tenant who was aware of the incident was Ms. Alvera's mother. There were no other records of tenant complaints or incident reports involving domestic violence though the evidence shows that incidents of domestic violence were occurring at the complex. Further, there was no evidence in the investigation to support an assumption that there is a greater probability that persons living in the immediate vicinity of a household that has incidents of domestic violence will themselves become victims of that violence.

The respondents also argued that their policy is consistent with and mandated by rules of Rural Development concerning properties funded by that agency. Rural Development has implemented regulations and procedures providing that: "Action or conduct of the tenant or member which disrupts the livability of the project by being a direct threat to the health or safety of any person, or the right of any tenant or member to the quiet enjoyment of the premises..." is grounds for termination of tenancy. However, Rural Development's rules and policies also provide: "It is not the intent that this provision of material lease violation apply to innocent members of the tenant's household who are not engaged in the illegal activity, nor are responsible for control of another household member or guest." The Rural Development representative responsible for monitoring Creekside Village Apartments stated that the rule protects innocent parties.

Respondent Corenevsky also stated that a reason that the respondents evict the entire household is because a TRO doesn't stop violence, and many men are not afraid of TROs. The results of national studies on the effectiveness of restraining orders in preventing future incidents of domestic violence are mixed. One study showed that in the six months after a restraining order is issued, 65% of the women who obtained the order reported no further domestic violence problems. Another study showed that future incidents of violence did occur even after a restraining order was obtained. However, the respondents' rationale is based on overbroad generalizations that do not take into account either the individual circumstances of the female victim tenant or all of the actions that she may have taken to prevent a recurrence of the violence. For example, in the case of Ms. Alvera, Mr. Mota was jailed, apparently subsequently left the country, and has had no further contact with Ms. Alvera.

In issuing a 24 hour notice, the respondents apparently also were relying on an Oregon State law, ORS 90.400(3), which permits landlords to issue a notice for a tenant to vacate the property within 24 hours if there is substantial personal injury to the landlord or other tenants. However, that law, and the legislative history behind it, were not intended to apply to innocent victims of violence. During the legislative process witnesses testified that: "There are special concerns about battered women who might be evicted under this provision because of the outrageous conduct of an abusive boyfriend; they would be punished twice; beaten by the boyfriend, then evicted because of the boyfriend's abuse."

5

The evidence taken as a whole establishes that a policy of evicting innocent victims of domestic violence because of that violence has a disproportionate adverse impact on women and is not supported by a valid business or health or safety reason by the respondents.

## V. CONCLUSION

For the foregoing reasons, the Department finds reasonable cause to believe that the complainant has been discriminated against because of her sex in violation of the Fair Housing Act. A copy of the Final Investigative Report is available by requesting the Report in writing addressed to the Fair Housing Hub, Northwest/Alaska Area, U.S. Department of Housing and Urban Development, 909 First Avenue, Suite 205, Seattle, Washington 98104.

4/13/01
Date

Judith A. Keeler
Director, Seattle Fair Housing Hub

6